[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 03-11016

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 30, 2004
THOMAS  K. KAHN
CLERK

D. C. Docket No. 02-00393-CR-2-1

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

KYUNG SIK KIM,
a.k.a. John Kim,

Defendant-Appellee.

_____

No. 03-11022

_____

D. C. Docket No. 02-00600-CR-1-1

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

IN OK KIM,
a.k.a. Cindy Kim,

Defendant-Appellee.

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

**(March 30, 2004)**

Before ANDERSON and BLACK, Circuit Judges, and NANGLE[*], District Judge.

BLACK, Circuit Judge:

In this sentencing guidelines case, Appellee Kyung Sik Kim pled guilty to conspiracy to defraud the United States, in violation of 42 U.S.C. § 1760(g) and 18 U.S.C. § 371. His wife, Appellee In Ok Kim, pled guilty to fraudulently obtaining government assistance, in violation of 42 U.S.C. § 1760(g). At sentencing, the district court granted each Appellee a downward departure from the guidelines based on their extraordinary restitution. The Government appeals. We hold extraordinary restitution, whether paid before or after adjudication of guilt, may, in the unusual case, support a departure from the guidelines, so we affirm the downward departure.

I. BACKGROUND

_____

[*] Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri, sitting by designation.

This case arises from Appellees' scheme to defraud the Special Supplemental Food Program for Women, Infants, and Children (WIC). WIC is a federal program designed to provide "supplemental foods and nutrition education" to "pregnant, postpartum, and breastfeeding women, infants, and young children from families with inadequate income." 42 U.S.C. § 1786(a). WIC is administered in Georgia by the Georgia Department of Human Resources through local offices. WIC operates much like a food stamp program. Individuals who qualify to receive WIC benefits receive food vouchers through local WIC offices.

Here, the relevant local WIC office was Southside Healthcare, Inc. At all relevant times, Southside employed Valencia Grant as a senior WIC clerk. Through her employment, Grant became acquainted with Carolyn Mitchell, an eligible recipient of Southside's WIC vouchers.

During May 1996, Mitchell recruited Grant into a scheme to defraud WIC. Grant used her position to steal unclaimed WIC vouchers from Southside. Mitchell then approached Appellees to sell these vouchers because Appellees were retailers who participated in WIC. Appellees bought vouchers from Mitchell at a discount while depositing the full amount of the voucher into their bank accounts. Over the three years that this scheme lasted, Appellees, Mitchell, and Grant

3

defrauded the United States of $268,237.03. Appellees' share was roughly two-thirds of these fraudulently obtained funds.

After they were indicted, Appellees negotiated plea agreements. Mr. Kim pled guilty to conspiracy to defraud the United States, in violation of 42 U.S.C. § 1760(g) and 18 U.S.C. § 371. Mrs. Kim, on the other hand, pled guilty to fraudulently obtaining government assistance, in violation of 42 U.S.C. § 1760(g).[1] Under their plea agreements, Appellees agreed to pay restitution in the amount of the entire fraud, $268,237.03, before sentencing, but expressly reserved the right to move the sentencing judge pursuant to U.S.S.G. § 5K2.0 (1997) for a downward departure on the basis of "extraordinary restitution."

On the same day Appellees pled guilty, they tendered $50,000 in personal funds as restitution. At sentencing, Appellees paid their remaining restitution by presenting a check for $218,237.03, and moved for a downward departure under U.S.S.G. § 5K2.0 (1997) on the basis of their extraordinary restitution. In support of their motion, Appellees asserted they went to significant lengths to obtain this money in the three short months between their guilty pleas and the sentencing hearing. Appellees contacted their family and friends in the United States and South Korea to secure loans so they could pay the United States full restitution.

---

[1] Mrs. Kim pled guilty despite the fact that she had passed a lie detector test.

After receiving permission from the trial court, Mrs. Kim traveled to South Korea and executed $97,000 in promissory notes, to be repaid within the following year at 9 percent interest, from four families who were friends of her parents. Mrs. Kim's brother-in-law, Nelson Ahn, liquidated $50,000 of his stock portfolio to make another loan to the Kims at no interest. Mrs. Kim also asked her parents to lend her and her husband $25,000 at no interest. Mr. Kim obtained additional loans of $10,000 and $11,000 from two friends in Georgia. Finally, Appellees withdrew the remaining balance of $25,000 from their savings account.

Applying the 1997 sentencing guidelines,[2] the pre-sentence investigation report recommended that the district court sentence Mr. Kim at level 13, criminal history category II, with a resulting guideline range of 15–27 months' imprisonment, and Mrs. Kim at level 10, criminal history category I, with a resulting guideline range of 6–12 months' imprisonment. The district court, however, found Appellees' restitution was extraordinary and granted their motion for a downward departure. Although the Government argued that Appellees were providing restitution only as an attempt to receive a reduced sentence, the district

---

[2] The district court applied the 1997 sentencing guidelines because they were in effect at the time of the offense and application of the 2002 guidelines would have violated the Ex Post Facto Clause. *See* U.S.S.G. § 1B1.11(b)(1) (2002).

court rejected that argument and found as a fact that their real reason was remorse. Specifically, the district court explained:

> The comments that [Appellees and their lawyers] all have made about the embarrassment, the humiliation, the shame, the sorrow they exhibited by finding themselves in this situation was so apparent to me. In my view their efforts to come up with this large amount of money is extraordinary, and the steps they've undertaken to come up with this money is extraordinary.

Accordingly, the district court departed downward and sentenced both Appellees at offense level 9. Mrs. Kim was sentenced to two years' probation, four months of which to be served as in-home detention. Likewise, Mr. Kim was sentenced to five years' probation, six months of which to be served as in-home detention. The Government appealed.

## II. STANDARD OF REVIEW

Whether extraordinary post-adjudication restitution is a discouraged or prohibited factor is a question of law subject to de novo review. 18 U.S.C. § 3742(e)(3)(B)(ii) (requiring de novo review when a sentence departure "is not authorized under section 3553(b)"); *Koon v. United States*, 518 U.S. 81, 100, 116 S. Ct. 2035, 2047 (1996) ("[W]hether a factor is a permissible basis for departure under any circumstances is a question of law, and the court of appeals need not defer to the district court's resolution of the point."); *see also* 18 U.S.C. 3553(b)

6

(allowing sentencing courts to depart when they find "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission"). Since Congress passed the PROTECT Act, the district court's conclusion that Appellees' restitution was extraordinary enough on these facts to warrant a departure is now also subject to de novo review.[3] 18 U.S.C. § 3742(e)(3)(B)(iii) (requiring de novo review when "the sentence is outside the applicable guideline range, and the sentence departs from the applicable guideline range based on a factor that is not justified by the facts of the case"). Nevertheless, we emphasize that the PROTECT Act does not remove any of the district court's traditional discretion in conducting fact finding, so the district courts factual findings remain subject to clearly erroneous review.[4] *Id.* § 3742 (stating that appellate courts "shall accept the findings of fact of the district court unless they are clearly erroneous").

---

[3] Previously, we reviewed a district court's decision to depart for abuse of discretion. *Koon*, 518 U.S. at 100, 116 S. Ct. at 2047–48. In 2003, however, Congress enacted the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003 (PROTECT Act). Pub. L. No. 108-21, § 1, 117 Stat. 650 (2003). Among other things, the PROTECT Act altered the standard of review we apply when considering most challenges to sentencing departures. *See* 18 U.S.C. § 3742. Retroactive application of the PROTECT Act's appellate standards of review does not violate the Ex Post Facto Clause, *United States v. Saucedo-Patino*, ___ F.3d ___ (No. 03-10946, Jan. 27, 2004), so we therefore apply the current statutory standard of review provisions.

[4] Furthermore, if the issue here involved whether "the sentence departs to an unreasonable degree from the applicable guideline range," 18 U.S.C. § 3742(e)(3)(C), we would "give due deference to the district court's application of the guidelines to the facts," *id.*

7

III.  DISCUSSION

A.     *Extraordinary Restitution as a Permissible Basis for Departure*

"To determine whether a factor which takes a case outside the heartland should result in a different sentence, a district court must first decide whether the factor is forbidden, encouraged, discouraged, or unaddressed by the guidelines as a potential basis for departure."  *United States v. Hoffer*, 129 F.3d 1196, 1200 (11th Cir. 1997) (citation omitted).  Accordingly, we first analyze whether extraordinary restitution is a prohibited or discouraged factor[5] upon which to depart downward.  This distinction is critical.  While district courts may *never* depart on the basis of prohibited factors, *Koon*, 518 U.S. at 95–96, 116 S. Ct. at 2045, district courts may *occasionally* depart on the basis of discouraged factors, *id.* at 96, 116 S. Ct. at 2045.  However, discouraged factors support departures "only if the factor is present to an exceptional degree or in some other way makes

---

[5] The difference between discouraged factors and encouraged factors already taken into account by the applicable guideline is purely semantic, not legal.  *Koon* instructs that "[i]f the special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present."  518 U.S. at 96, 116 S. Ct. at 2045 (citation omitted).  No legal consequences attach to this distinction because both categories only permit departures under identical circumstances.  For the sake of simplicity, therefore, we frame the issue as deciding whether extraordinary restitution is a prohibited or discouraged factor.

the case different from the ordinary case where the factor is present." *Id.* (citation omitted).

We now join the Second, Third, Fourth, Sixth, Seventh, Eighth, and Ninth Circuits and hold that extraordinary restitution is not a prohibited factor.[6] *See United States v. Broderson*, 67 F.3d 452, 458–59 (2d Cir. 1995) (affirming a district court's downward departure based in part on the defendant's restitution

[6] The Government suggests that the federal circuits are split when it contends that the Second, Fifth, and Sixth Circuits have held restitution to be a prohibited factor. *See, e.g.*, *United States v. Carpenter*, 320 F.3d 334, 343 (2d Cir. 2003); *United States v. Akin*, 62 F.3d 700, 702 (5th Cir. 1995); *United States v. DeMonte*, 25 F.3d 343, 346 (6th Cir. 1994); *United States v. Flowers*, 55 F.3d 218, 222 (6th Cir. 1995)). We doubt there is a circuit split because none of these cases hold extraordinary restitution to be a forbidden factor. Admittedly, in *Carpenter* the Second Circuit explained that because "*restitution before conviction cannot justify a downward departure*, we do not think that compliance with court-ordered restitution after conviction and sentencing can." *Carpenter*, 320 F.3d at 343 (emphasis added). However, the Second Circuit had previously stated that restitution is a discouraged factor. *United States v. Broderson*, 67 F.3d 452, 458–59 (2d Cir. 1995). Under Second Circuit law, because *Broderson* was decided by a prior panel, and *Carpenter* was not an en banc decision, *Broderson* is the controlling precedent. *See Shattuck v. Hoegl*, 523 F.2d 509, 514 n.8 (2d Cir. 1975) (explaining that subsequent panel decisions, "not being an en banc decision, may not be viewed as having overruled our earlier [panel decision]"). In *Akin*, the Fifth Circuit merely dealt with restitution as a basis for *reduction within* the guidelines, not *departure from* the guidelines. *Akin*, 62 F.3d at 702 (concluding that "the district court properly refused to reduce its calculation of loss by the amount of the restitution"). In *DeMonte*, the Sixth Circuit expressly stated that "we have acknowledged that restitutionary payments may constitute 'exceptional circumstances' that justify a downward departure." *DeMonte*, 25 F.3d at 346 (citing *United States v. Brewer*, 899 F.2d 503, 509 (6th Cir. 1990)). Finally, *Flowers* only involved defendants who returned money they had fraudulently obtained through a check kiting scheme, *Flowers*, 55 F.3d at 222, not defendants who obtained loans to pay restitution. More fundamentally, *Flowers* suffers from the same defect as *Carpenter*—it is not binding Sixth Circuit law on this issue because it was simply a panel decision issued after *DeMonte*. *See United States v. Washington*, 127 F.3d 510, 517 (6th Cir. 1997) ("'The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.'" (quoting *Salmi v. Sec'y of Health and Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985)).

even though it could be justified "only as a 'discouraged departure'" given that, "[o]rdinarily, payment of restitution is not an appropriate basis for downward departure under Section 5K2.0 because it is adequately taken into account by Guidelines Section 3E1.1"); *United States v. Lieberman*, 971 F.2d 989, 996 (3d Cir. 1992) (affirming a district court's downward departure on the basis of the defendant's acceptance of responsibility as primarily demonstrated by his restitution); *United States v. Hairston*, 96 F.3d 102, 108 (4th Cir. 1996) (holding that "restitution, although taken into account in the guideline permitting a reduction for acceptance of responsibility, can provide a basis for a departure when present to such an exceptional degree that it cannot be characterized as typical or 'usual'" (citation omitted)); *United States v. DeMonte*, 25 F.3d 343, 346 (6th Cir. 1994) (stating that "we have acknowledged that restitutionary payments may constitute 'exceptional circumstances' that justify a downward departure" (citing *United States v. Brewer*, 899 F.2d 503, 509 (6th Cir. 1990)); *United States v. Bean*, 18 F.3d 1367, 1369 (7th Cir. 1994) ("Undoubtedly there are circumstances that would justify using § 5K2.0 to [depart downward on the basis of restitution] beyond [the] two levels [of reduction provided by § 3E1.1].");
*United States v. Oligmueller*, 198 F.3d 669, 672 (8th Cir. 1999) (affirming a district court's downward departure on the basis of extraordinary restitution

10

because "[w]e have previously held that cases can fall outside the heartland when there are extraordinary efforts at restitution" (citing *United States v. Garlich*, 951 F.2d 161, 163 (8th Cir. 1991)); *United States v. Miller*, 991 F.2d 552, 553–54 (9th Cir. 1993) (holding that district courts may depart downward on the basis of restitution when it (1) "shows acceptance of responsibility," (2) "was substantially greater than that contemplated by the Commission when drafting section 3E1.1," and (3) "the magnitude of the departure [is] commensurate with the level of the defendant's acceptance of responsibility").[7]

In particular, we conclude that the Sentencing Commission never prohibited the district court from considering Appellees' extraordinary restitution as a basis for downwardly departing from the sentencing guidelines because we are persuaded by the Fourth Circuit's mode of analysis in *Hairston*, 96 F.3d at 107–08. There, the Fourth Circuit was presented with the question whether extraordinary restitution was a discouraged or prohibited factor. *Id.* at 107. In *Koon*, the Supreme Court had instructed that "[i]f the special factor is a

---

[7] Our conclusion also appears consistent with the law in the First and D.C. Circuits. *See United States v. Rivera*, 994 F.2d 942, 956 (1st Cir. 1993) (holding that "*ordinary* restitution circumstances . . . do not warrant a downward departure," but stating in dicta that "a *special* need of a victim for restitution, and the surrounding practicalities, might, in an unusual case, justify a departure" (citations omitted)); *see also United States v. Rhodes*, 145 F.3d 1375, 1382–83 (D.C. Cir. 1998) (finding *Hairston*'s rule persuasive in concluding that post-conviction rehabilitation is a discouraged factor).

11

discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Koon*, 518 U.S. at 96, 116 S. Ct. at 2045 (citation omitted). Applying *Koon*, the Fourth Circuit concluded extraordinary restitution was not a forbidden factor because "[n]owhere in the Guidelines is restitution listed as a proscribed factor." *Hairston*, 96 F.3d at 107. Likewise, the Fourth Circuit also noted that restitution was not expressly listed as a discouraged or encouraged factor for departure from the guidelines. *Id.* However, the Fourth Circuit recognized restitution was listed as a factor supporting reduction within the guidelines. *Id.* (citing U.S.S.G. § 3E1.1, cmt. n.1(c) (1995)). Accordingly, this question appeared to fall through the cracks of the rigid categories set forth in *Koon* because the Sentencing Commission did not seem to discourage, prohibit, or encourage departures on the basis of extraordinary restitution. To resolve this dilemma, the Fourth Circuit crafted a new rule: "When the Commission designates a factor as a basis for a reduction *within* the Guidelines, this implies that the factor is discouraged as a basis for departure *from* the Guidelines, or alternatively, that the factor is encouraged—at least as a basis for reduction—but has already been taken into account." *Id.*

12

We agree with the Fourth Circuit's statement of this rule. Like *Hairston*, we note in the instant case that although the 1997 sentencing guidelines do not list restitution as a prohibited factor for departure from the guidelines, U.S.S.G. § 5H1.1–5H1.12 (1997), restitution is listed as a factor supporting reduction within the guidelines, U.S.S.G. § 3E1.1, cmt. n.1(c) (1997).[8] We therefore conclude that extraordinary restitution is a discouraged factor.[9]

---

[8] The 1997 sentencing guidelines direct district courts that "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." U.S.S.G. § 3E1.1(a) (1997). In determining whether the defendant clearly accepted responsibility, Application Note 1(c) instructs district courts that an appropriate consideration is whether the defendant made "voluntary payment of restitution prior to adjudication of guilt." U.S.S.G. § 3E1.1, cmt. n.1(c) (1997).

[9] Two further arguments bear mention. First, contrary to the Government's contention, Appellees' compliance with their legal duty to pay restitution before sentencing under the plea agreement does not transform their restitution into a prohibited factor. In *Hoffer*, this Court held that a defendant's acquiescence in a civil forfeiture requiring him to disgorge $50,000 of profits from drug trafficking was a prohibited factor on which to depart downward. 129 F.3d at 1204. We explicitly decline to extend *Hoffer* to cases involving restitution as a basis for departure, because Appellees' restitution required under their plea agreement is not analogous to mandatory forfeiture. Appellees *voluntarily* sought loans from family members. The plea agreement did not require them to take this additional action. In short, Appellees' voluntary actions in obtaining loans were not a prohibited factor under *Hoffer* because they do not fall within *Hoffer*'s rubric.

Second, the recent amendment to the sentencing guidelines, in light of the PROTECT Act, sheds no light on our analysis. U.S.S.G. app. C, amend. 651, at 347 (2003). Even if the recent amendment now prohibits district courts from departing downward on the basis of extraordinary restitution, *see* U.S.S.G. § 5K2.0(d)(2) (2003) (prohibiting district courts from departing based on the "defendant's acceptance of responsibility"); *id.* § 5K2.0(d)(5) (prohibiting district courts from departing based on the "defendant's fulfillment of restitution obligations only to the extent required by law including the guidelines (i.e., a departure may not be based on unexceptional efforts to remedy the harm caused by the offense)"), our conclusion that extraordinary restitution is merely a discouraged factor under the 1997 guidelines disposes of its relevance. Since we already concluded that extraordinary restitution was merely discouraged under the 1997 guidelines, the current amendment is a substantive change that cannot be applied retroactively. *See* U.S.S.G. § 1B1.11(b)(2) (1997); *see also United States v. Descent*, 292 F.3d

Still, the Government argues that departures based on restitution paid after adjudication of guilt are prohibited rather than discouraged because the Sentencing Commission has prohibited departures on the basis of socio-economic status. U.S.S.G. § 5H1.10 (1997). We disagree. On the contrary, we conclude extraordinary restitution paid after adjudication of guilt is not a forbidden factor for two reasons. First, if departures based on extraordinary post-adjudication restitution were forbidden by § 5H1.10, then departures based on extraordinary pre-adjudication restitution would also be forbidden—restitution always involves money, which necessarily implicates socio-economic status. But this distinction would be illogical because we already held that pre-adjudication restitution is merely a discouraged factor.

Second, distinguishing between defendants who paid restitution before adjudication and those who paid after adjudication, ironically, would violate § 5H1.10's prohibition of departures based on socio-economic status. If extraordinary restitution were a basis of departure available only to those defendants who were able to collect enough money to pay restitution *before* pleading guilty, this would discriminate against those defendants who were too poor to collect enough money to pay restitution until *after* pleading guilty.

702, 707–08 (11th Cir. 2002).

14

Significantly, although Appellees are not rich, they started paying restitution before adjudication by tendering $50,000 of their life savings with their guilty plea, but were financially unable to complete their restitution until they obtained a large number of loans in the three short months between adjudication and sentencing. If Appellees had been rich, they would have tendered the entire amount of their restitution before they pled guilty.

In short, we refuse to follow the Government's suggestion that we discriminate against Appellees' socio-economic status for the sake of remaining neutral with respect to all defendants' socio-economic status. Instead, we are persuaded by the comments of the late Senior Circuit Judge Celebrezze:

> [A] defendant . . . should be judged by his actions. The fact that he may have some economic means should neither be held for him or against him. To suggest that when a defendant is affluent, his attempts at restitution can never qualify as an exceptional circumstance[] is as repugnant to equal protection ideology as to hold the lack of ability to make restitution against an indigent defendant. It is clear that in some cases, the *methods* by which a defendant makes restitution may qualify as an exceptional circumstance, above and beyond what is considered in the Guidelines.

*United States v. DeMonte*, 25 F.3d 343, 355 (6th Cir. 1994) (Celebrezze, J., concurring in part and dissenting in part).

B.    *Whether Appellees' Restitution Was Extraordinary Enough*

15

Having decided that extraordinary post-adjudication restitution is merely a discouraged, not prohibited, factor upon which to depart downward, we proceed to discuss whether Appellees' payment of restitution was extraordinary enough to remove it from the heartland of restitution cases and warrant a downward departure. *See Koon*, 518 U.S. at 96, 116 S. Ct. at 2045; *Hoffer*, 129 F.3d at 1201. Although this is a very close issue, we conclude the district court properly found Appellees' payment of restitution was extraordinary enough to remove it from the heartland of cases because it demonstrated their sincere remorse and acceptance of responsibility.

Instead of creating concrete legal rules with which to determine whether particular payments of restitution are extraordinary enough to warrant downward departures, courts have looked to a wide range of factors, such as the degree of voluntariness, the efforts to which a defendant went to make restitution, the percentage of funds restored, the timing of the restitution, and whether the defendant's motive demonstrates sincere remorse and acceptance of responsibility. *See, e.g.*, *Oligmueller*, 198 F.3d at 672 (emphasizing timing, voluntariness, efforts at restitution, and percentage of funds restored); *Hairston*, 96 F.3d at 108–09 (emphasizing the percentage of funds restored, efforts at restitution, voluntariness, timing, and motive); *DeMonte*, 25 F.3d at 347 (emphasizing voluntariness);

16

*Lieberman*, 971 F.2d at 996 (emphasizing timing and percentage of funds restored). We believe this is the proper inquiry.

Emphasizing the voluntariness, timing, and motive of Appellees' restitution, the Government argues this case remains within the heartland because Appellees did not pay restitution until after they had been criminally indicted, as part of a negotiated plea agreement, and in the hope of receiving a reduced sentence. Appellees, on the other hand, emphasize their restitutionary efforts, percentage of funds restored, and their sincere remorse, and suggest four factors that remove this case from the heartland. First, Appellees personally benefitted from only about two-thirds of the loss $268,037.18 loss, yet they provided restitution for the entire loss caused by the fraud. Second, they came up with this money by liquidating three-fourths of their life savings and obtaining nearly $200,000 in loans from friends and family. Third, Mrs. Kim passed a lie detector test and would not have pled guilty to her misdemeanor charge and borrowed nearly $200,000 except to show her extreme remorse. Fourth, Appellees began making restitution on the same day they were adjudicated guilty and paid the rest before sentencing. Fifth, Appellees' reason for making restitution was their sincere remorse.

Comparing the Government's factors to Appellee's factors, the Government's factors are less significant than Appellees' factors. We agree with

the Government that the timing of Appellees' payment—specifically, their failure to pay restitution before criminal indictment, and only pursuant to a negotiated plea agreement—cuts against the voluntariness of their act and militates against granting a downward departure. However, we see no need to draw a bright line rule that limits departures based on extraordinary restitution to those defendants who paid restitution before indictment and not pursuant to a plea agreement. Such a rule would impermissibly favor economically privileged defendants who have readily available funds. Additionally, the district court already rejected the Government's factual argument that Appellees' motive was to receive a reduced motive. After considering the evidence before it, the district court concluded that Appellees were motivated by remorse and "the embarrassment, the humiliation, the shame, the sorrow" they felt about their actions. We cannot find that the district court was clearly erroneous when it made this factual finding.

Instead, Appellees' factors are more significant and balance in favor of granting a departure from the guidelines. First, Appellees paid roughly 140 percent of the amount from which they personally benefitted. Even though Appellees had agreed to pay restitution for the whole amount of the fraud in their plea agreement, the fact that they made and carried out their commitment to pay back money they never received simply demonstrates their extraordinary remorse.

18

Second, like the district court, we are impressed at the lengths to which Appellees went in obtaining the money to make restitution. Appellees dipped significantly into their life savings and voluntarily undertook an enormous amount of debt, to wit, almost $200,000. Third, Mrs. Kim particularly went out of her way to demonstrate her remorse because, despite passing a lie detector test and pleading guilty to a misdemeanor charge, she solicited her relatives to secure enormous loans to pay off her restitution obligation. Fourth, Appellees also began paying what they could by liquidating $50,000 of their life savings when they pled guilty, and then paid the balance of their restitution obligation three short months later at sentencing. Finally, it is significant that the district court found as a fact that Appellees' reason for making restitution was their sincere remorse. Simply put, Appellees are the rare defendants who demonstrated their extraordinary remorse and acceptance of responsibility by making extraordinary restitution.

## IV. CONCLUSION

For the foregoing reasons, extraordinary restitution, whether paid before or after adjudication, is merely a discouraged factor on which to depart downward. Furthermore, the district court properly found that Appellees' payment of restitution was extraordinary enough to remove this case from the heartland and

19

justify a downward departure because it demonstrated Appellees' sincere remorse and acceptance of responsibility.

AFFIRMED.

NANGLE, District Judge, concurring:

I concur in the opinion in this case because the Panel very carefully finds that "extraordinary restitution" is merely a "discouraged" and not a "prohibited" factor. Additionally, the Panel correctly finds that the District Court's findings are subject to the clearly erroneous rule. I write only to emphasize the closeness of the question and the narrow and limited basis for the affirmance herein.

As stated in the opinion and as reflected in the facts before the District Court, the remorse of the defendants was truly "extraordinary." Indeed, in more than 30 years as a district judge, I have never participated in, or had brought to my attention, any previous case in which a defendant's restitution justified a departure downward. This 30-year period included cases occurring well before the Sentencing Guidelines were adopted (wherein a defendant's restitution could arguably have supported a lesser sentence).

The Panel confirms the four factors that support the District Court's finding that the defendants were motivated by remorse. It should also be noted that the defendants had no assurance that their restitution efforts would be rewarded by the District Court at sentencing, since the government clearly indicated in the plea agreement that it would oppose such a downward departure.

21

The district judge had the opportunity to assess, face-to-face, the Kims' remorse in making full restitution. Based upon the totality of the circumstances and the presence of factors indicative of the Kims' remorse, the District Court's finding regarding extraordinary restitution is not clearly erroneous.