**PUBLISH**

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 94-4021 & 96-4878
_____

D. C. Docket No. 92-218-CR-UU-B

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSE FERNANDEZ,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

**(March 17, 1998)**

Before ANDERSON and BIRCH, Circuit Judges, and WOODS[*], Senior
District Judge.

_____

[*]Honorable Henry Woods, Senior U.S. District Judge for the
Eastern District of Arkansas, sitting by designation.

BIRCH, Circuit Judge:

In this consolidated appeal, Jose Fernandez, a former Miami-Dade police officer, challenges his conviction for conspiracy to import and distribute cocaine, 21 U.S.C. §§ 963 and 846, as well as the district court's denial of his motion for a new trial. For the reasons that follow, we vacate the district court's order denying Fernandez' request for a new trial and remand this case for an evidentiary hearing. In remanding this case, we specifically direct the district court to explore the merits of Fernandez' claims that the government withheld material, exculpatory evidence in violation of the principles enunciated in Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and that newly-discovered evidence requires that he receive a new trial. We deem all remaining contentions raised in these appeals to be without merit.

## I. BACKGROUND

Viewing the facts in the light most favorable to the government, United States v. Keller, 916 F.2d 628, 632 (11th Cir. 1990), we find the following circumstances underlying Fernandez' case to be undisputed:  Enrique Zamorano became involved in the drug trade in 1984 while working as a baggage handler at Miami International Airport.  Initially, Zamorano unloaded small quantities of cocaine from airplanes originating in Colombia.  In 1987, Zamorano and his Colombian associates sought to expand their business by bringing larger quantities of cocaine into the cargo facilities in Miami.  At first, Zamorano transported cocaine on cargo flights from both Haiti and Venezuela into Miami.  The cocaine was supplied by a Colombian distributor, Florentino Fernandez.  During these years, Zamorano also participated in several business enterprises created to launder the proceeds from cocaine shipments.  Zamorano's United States-based operations gradually grew to include, among other individuals, Orlando Fernandez, Hector Aguilar, and Jean Francois.

It is beyond dispute that multiple massive shipments of cocaine successfully entered the United States through Zamorano's organization. The particular shipment at issue in this case, however, implicates the following events: In 1991, a joint task force comprised of United States Customs ("Customs") agents and agents of the Drug Enforcement Administration ("DEA") were acting in cooperation with the Venezuelan National Guard ("VNG") to effect controlled deliveries of cocaine from Caracas, Venezuela, into Miami. The DEA also had an office in Caracas that was actively involved in this joint effort. The DEA and VNG both used an informant, denominated "Cristobal" or "Cristo" [hereinafter Cristo], who acted as a broker between Zamorano and Florentino Fernandez. Cristo was controlled primarily by General Ramon Guillen Davila ("General Guillen") of the VNG; the only contact the DEA was able to have with Cristo was communicated through General Guillen.

In 1989, Zamorano established an airline, Aerolinas Latinas, to transport cargo from Venezuela into the United States. Although the

4

airline originally functioned as a legitimate enterprise, Zamorano decided in 1990 to use the airline to smuggle cocaine into Miami's airport. In October 1990, Zamorano had a large crate built in the United States and flown to Caracas filled with automobile parts. After the plane's arrival in Venezuela, however, the VNG destroyed this crate. Zamorano had a second crate built; in this instance, he sent specifications for the crate to Cristo, who had the crate constructed and delivered to the VNG. At the same time, Cristo conveyed to the VNG approximately 1,200 kilograms of cocaine that had been shipped to Zamorano – through Cristo – by Florentino Fernandez. The VNG and DEA agreed to make a controlled delivery of this cocaine. In early November 1990, however, the VNG attempted to transport the cocaine on Aerolinas Latinas without the DEA's knowledge or participation. The VNG's attempt was unsuccessful because the crate did not fit through the plane's cargo door.

Zamorano next devised another strategy to transport the cocaine from Venezuela to Miami: he used cargo pallets, normally not subject to Customs' inspection, to store the cocaine. Specifically, Zamorano's plan involved using stacks of pallets that had been hollowed out, placing small crates of cocaine into the hollowed areas, stacking the crates between uncut pallets, and banding them together. Several of Zamorano's associates, including Cristo, helped to orchestrate Zamorano's plan. On November 8, 1990, the first shipment containing approximately 410 kilograms of cocaine was successfully shipped into Miami undetected by law enforcement.

One week later, Zamorano attempted a second shipment by this method. In this instance, the VNG made the DEA aware of the intended shipment and the two agencies again planned a controlled delivery into Miami. The VNG loaded the cocaine into the plane and indicated on a tally sheet provided to the DEA that it had transported approximately 602 kilograms of cocaine in this shipment; it is

undisputed, however, that U. S. law enforcement personnel seized only 400 kilograms of cocaine after this shipment arrived in the United States.

Orlando Fernandez, Jean Francois, Hector Aguilar, and Zamorano all testified as part of the government's case at Fernandez' trial. Each co-conspirator's testimony supported the government's allegation that Fernandez had "tipped off" Zamorano by informing him that the November 16 shipment was under surveillance. Orlando Fernandez, Fernandez' cousin, testified that Fernandez had expressed interest in becoming chief of security at Zamorano's airline and had provided Zamorano on many occasions with information regarding whether drug shipments were "safe" to retrieve at the airport. Jean Francois, Hector Aguilar, and Zamorano all testified that, immediately prior to the November 16th shipment's arrival in Miami, Fernandez attempted to contact Zamorano to inform him that the delivery would be under surveillance by law enforcement. Each of the co-conspirators further testified that

Fernandez (1) met with Zamorano on November 17th and pointed out to him U. S. Customs' surveillance vehicles at the Miami airport; (2) met with Zamorano, Orlando Fernandez, and others later that evening and helped the conspirators to devise a way to "unload" the cocaine by delivering the shipment to Customs agents; (3) had an informant associated with Customs in Puerto Rico who regularly provided him with information regarding planned surveillance of cargo planes into Miami; and (4) periodically received payments from Zamorano for his assistance.  In addition, the government presented at trial several taped conversations between Fernandez and Orlando Fernandez.  Although the contents of these conversations implicated Fernandez with respect to his involvement in Zamorano's organization, Fernandez made no conclusive admission of his own complicity.

Fernandez' defense at trial, reduced to its simplest terms, was that he was "in the wrong place at the wrong time" and that there were other more likely "tipsters" who may have informed Zamorano

that federal law enforcement officers were aware of the November 16th drug shipment. Several DEA agents testified regarding the machinations of the conspiracy in its entirety; in each case, Fernandez attempted to elicit testimony from the agents that either General Guillen, a suspected corrupt official, or Cristo, a known informant, could have "tipped" the shipment. DEA agents also testified that, when Fernandez was arrested, he stated that he was "nowhere near the top" of Zamorano´s organization. Fernandez attempted to show, through cross-examination, that this statement was intended to be sarcastic. Fernandez also presented to the jury evidence contained in a DEA report indicating that Orlando Fernandez had told the DEA that Cristo had been the tipster. Fernandez testified on his own behalf and admitted that he had met several of the individuals associated with the conspiracy – including Zamorano – through his cousin, Orlando Fernandez. Fernandez conceded that he had tried to contact Zamorano on the evening of November 16th, but only to relay to Orlando Fernandez that he

needed a place to stay that night due to marital difficulties; the same explanation essentially accounted for his presence at a meeting with Zamorano and Orlando Fernandez later that evening. Ruben Gonzalez, the Customs agent alleged by the government to be Fernandez' informant, also took the stand and testified that he and Fernandez, like many state and federal law enforcement officers, frequently shared information but did not provide "tips" for illicit purposes. Fernandez was acquitted of the substantive charges of possession and importation of cocaine, but convicted of conspiracy to possess with intent to distribute and to import cocaine. Fernandez was sentenced to 30 years' imprisonment.

During the course of the trial, several news reports appeared indicating that General Guillen had been arrested in Venezuela for his suspected involvement in the drug trade. The reports further alluded to the relocation of two DEA agents suspected of being romantically involved with General Guillen and his lieutenants, as well as a CIA agent, Mark McFarlin. The court held an in camera

10

hearing outside the presence of both the defendant and his attorney to discuss the possible implications of these reports. The transcript of that hearing remains sealed from the defendant. As a result of the hearing, the court ordered the government to produce for the defendant: (1) any reference in a report that would suggest that someone other than the defendant was in a position to tip the load of cocaine; (2) information which describes the nature and scope of General Guillen's narcotics trafficking activities; and (3) information that suggests that a DEA agent associated with this case may have "crossed the line." Following a second ex parte hearing, the court revealed to the defendant, pursuant to Brady, that evidence existed showing that Zamorano had made several payments to Cristo following both the November 8 and November 16th shipments. It is unclear whether any further Brady material was produced. The thrust of this appeal is whether the government fulfilled its obligation to convey to the defendant all the material information of which it

11

was aware that would "point the finger" at other potential tipsters regarding the shipment at issue.

Subsequent to Fernandez' trial, more news reports appeared describing involvement of the DEA, CIA, and VNG in drug shipments from Caracas to the United States during the relevant time period. Many of the allegations contained in these reports concerning corruption, inefficiency, and romantic liaisons between officials in the DEA and VNG already were known -- or were made known -- to Fernandez during his trial. The only news reports that bear directly on this appeal are those that describe the possible participation of the CIA in the drug trafficking activities at issue.

Numerous newspaper accounts charged that the CIA had funded an anti-drug unit that had smuggled substantial quantities of cocaine into the United States in uncontrolled deliveries approved by the agency; that General Guillen had worked closely with the CIA and, in particular, with CIA agent Mark McFarlin, who had possibly "tipped off" Guillen regarding investigation into a shipment of

12

cocaine; that the DEA had refused to participate in these uncontrolled deliveries; and that the CIA expressly may have authorized the November 8th shipment of cocaine that successfully entered the United States.  R1-263, Exh. 3.

Fernandez now argues that the information contained in these reports either was known or should have been known to the government at the time of trial, was not divulged, and was exculpatory; in the alternative, he suggests that the news reports present newly discovered evidence that warrants an evidentiary hearing and a retrial.  The government neither confirms nor denies the accuracy of the reports but avers that, even assuming the information contained in the newspaper accounts is true, the outcome of Fernandez' trial would not have been altered had he possessed this information.

The district court denied Fernandez' motion for a new trial or evidentiary hearing and stated that the substance of the reports was known to Fernandez at the time of trial; the conclusions drawn by

13

Fernandez from the reports a matter of rank speculation; and the information contained therein merely cumulative or impeaching.

## II. DISCUSSION

We review the district court's denial of a motion for a new trial based on a Brady violation for abuse of discretion. United States v. Kersey, 130 F.3d 1463, 1465 (11th Cir. 1997). A Brady claim is available if either exculpatory or impeachment evidence is suppressed, regardless of the good faith or bad faith of the prosecution. United States v. Yizar, 956 F.2d 230, 233 (11th Cir. 1992). A defendant who seeks a new trial based on an alleged Brady violation must show that, had the evidence been revealed to the defense, there is a reasonable probability that the outcome of the proceeding would have been different. See United Stated v. Newton, 44 F.3d 913, 918 (11th Cir. 1995).

Our review of the district court's denial of a motion for a new trial based on newly discovered evidence is subject to the abuse of

discretion standard.  <u>United States v. Obregon</u>, 893 F.2d 1307, 1312 (11th Cir. 1990).  Similarly, we review the district court's denial of an evidentiary hearing for abuse of discretion.  <u>United States v. Massey</u>, 89 F.3d 1433, 1443 (11th Cir. 1996), <u>cert. denied</u>, ___ U.S. ___, 117 S. Ct. 983, 136 L. Ed. 2d 865 (1997).  To obtain a new trial based on newly discovered evidence, a "movant must demonstrate that the evidence was discovered after trial, that due diligence was shown, and that the evidence was neither cumulative nor impeaching but actually material and likely to produce a new result." <u>Branca v. Security Ben. Life Ins. Co.</u>, 789 F.2d 1511, 1512 (11th Cir. 1986) (per curiam).

Fernandez contends that the information concerning the alleged involvement of the CIA in drug shipments from Caracas into Miami generally and, more particularly, the shipments described in this case, coupled with the newly-established link between the CIA and General Guillen would have afforded him a far stronger defense. Specifically, he suggests that this information would have allowed

him to show that General Guillen and Cristo were not simply "double dealers" but, rather, were working closely with the CIA and had a motive to "tip" the shipment. Fernandez further argues that he cannot ascertain whether this evidence is Brady or newly discovered evidence because the in camera hearings held during the trial, during which Brady material was discussed, were held outside the presence of defense counsel and remain sealed.

The government responds that Fernandez has concocted a far-fetched, imaginative theory to justify a retrial. It is worth noting, however, that the government does not deny the essential veracity of these news reports which are, by themselves, extraordinary and troubling. Although the government presented a formidable case against Fernandez at trial, it was based almost exclusively on the testimony of co-conspirators. While the uncorroborated testimony of co-conspirators can be sufficient to support a conviction, see United States v. Broadwell, 870 F.2d 594, 601 (11th Cir. 1989), our inquiry at this stage is whether evidence of the CIA's possible link to

the very drug shipments at issue in this case either reasonably might have affected the outcome of the proceeding or, in the alternative, would likely produce a different result if the case were retried.  In our view, the district court too easily brushed aside the possible impact that these rather sensational allegations might have had on Fernandez' case.  Fernandez tried to establish that, due to the overall corruption in the VNG and possibly the DEA, other possible "tipsters" existed, but his case was vulnerable  -- if not thoroughly implausible -- without the various bits and pieces of information needed to create a coherent alternate theory of the case.  Much of the information that Fernandez did obtain during the trial came from news reports that were never officially corroborated by the government; conversations regarding the veracity and potential implications of these news reports, moreover, consistently were held outside the presence of both the defendant and his attorney.  At this stage, it is impossible to discern whether the addition of evidence of a possible CIA-link to this case would have completed the puzzle

and thereby created for the jury reasonable doubt or whether, as the district court determined, the evidence was merely cumulative. In light of the fact that the government's case against Fernandez was based almost exclusively on the testimony of co-defendants, however, and because the allegations potentially implicating the CIA are responsive directly to the defense that Fernandez attempted to present, we conclude that these allegations are, at the very least, significant enough to permit Fernandez to present his case at a hearing.

We express no opinion as to whether Fernandez ultimately will succeed in his effort to demonstrate that the evidence contained in media reports concerning the possible involvement of the CIA in this case impugned his verdict. Fernandez has proffered, however, sufficient evidence that these allegations and reports could materially have affected his trial such that an evidentiary hearing is appropriate. We further note that a hearing is necessary to parse out the Brady elements of Fernandez' claim from the request for a

new trial based on newly discovered evidence. Accordingly, we VACATE the district court's order denying Fernandez' motion for a new trial and REMAND this case for an evidentiary hearing consistent with this opinion.