[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 27, 2005
THOMAS K. KAHN
CLERK

_____

No. 03-10929

_____

D. C. Docket No. 97-06063-CR-KLR

UNITED STATES OF AMERICA,

Plaintiff-Appellee
Cross-Appellant,

versus

BARBARA ANN MURRAY,
JAMES STUART FALLER, II,
a.k.a. Jarrett Rouge,
a.k.a. Jim Faller,

Defendants-Appellants,
Cross-Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(September 27, 2005)**

Before BARKETT and MARCUS, Circuit Judges, and GEORGE[*], District Judge.

PER CURIAM:

Barbara Ann Murray and James Stuart Faller, II, appeal their convictions for conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, and conspiracy to launder money in violation of 18 U.S.C. § 1956(a)(1)(A)(i). Murray also appeals her conviction for wire fraud in violation of 18 U.S.C. §§ 1343 and § 2. The government cross-appeals Murray and Faller's sentences, arguing that the grant of a downward departure was erroneous as a matter of law, and that the district court should have held each of the defendants responsible for the entire amount of laundered funds, resulting in higher sentences.

## I. BACKGROUND

According to the case presented by the government, Richard Adam concocted a scheme to defraud people seeking venture capital loans. In exchange for advance payment of a substantial fee, Adam and his associates falsely promised to obtain multimillion dollar loans for would-be borrowers. Adam initially used the corporate name R.A.A. International Corporation and operated out of his condominium in Miami Beach, Florida. He subsequently hired Rolan Colon to solicit clients for loans, telling Colon that he had a trust in Europe that would fund

---

[*] Honorable Lloyd D. George, United States District Judge for the District of Nevada, sitting by designation.

the transactions. Although he initially believed Adam, Colon ultimately came to realize the fraudulent nature of the transactions.

In early 1992, Barbara Murray went into business with Adam, making him a partner in her Connecticut company in exchange for the payment of her furniture bills. The partnership operated under the name of Murray's existing business in Stamford, Connecticut, International Business Services Alliance, Inc. (IBSA). In November 1992, Colon and Adam opened an office in Fort Lauderdale, Florida. And in January of 1993, Faller joined the company and opened IBSA of Tampa, Inc. Faller served as president of IBSA of Tampa, with Colon as vice-president, Adam as secretary, and Murray the treasurer.

By the time IBSA of Tampa opened, Colon knew that Adam's true objective in marketing these loans was to keep the advance fees without providing loans. After IBSA of Tampa was created, Faller, Colon, and Murray spoke almost every day. When Colon, Murray and Faller received advance fees from the victims, they forwarded the money to Adam, who by 1993 was living in Luxembourg.[2] Adam then remitted money to Murray, Faller and Colon for office expenses, salaries, bonuses and other expenses.

From July 1992 to January 1994, Murray received $3,446,000 in advance

---

[2] In March 1993, Adam opened IBSA of Luxembourg.

fees from prospective borrowers, promising the victims that they would receive loans to expand or start their businesses. If the loans Murray promised had been made, the trust would have made approximately $1.4 billion in loans. From March through December 1993, Faller received $1,053,500 in advance fees. Faller's promised loans amounted to over $144 million. In addition, Faller set up a company next to his IBSA office called First Quantum International (FQI), through which he ran an identical fraudulent scheme–but did not have to share the fees with Adam. Through the FQI scheme, Faller received $439,800 in fee payments and promised loans totaling over $566 million which were never made.

Murray and Faller were indicted and convicted after trial in May 2000. Colon, who had pled guilty to the scheme, was a prime witness against Murray and Faller.[3]

## II. CONVICTION ISSUES

### A.    Brady Claims

Murray and Faller first argue that the government violated Brady v. Maryland, 373 U.S. 83 (1963), by belatedly disclosing FBI notes which materially contradicted the testimony of key witnesses at trial which had established the defendants' awareness of the ongoing fraud.

_____

[3] Adam, the lead defendant, was arrested in Canada, but fought extradition and was not tried with Murray and Faller.

Brady v. Maryland, 373 U.S. 83 (1963), imposes a duty on the prosecutor to disclose material evidence that is favorable to the accused. See United States v. Bagley, 473 U.S. 667, 674 (1985). The duty includes impeachment evidence as well as exculpatory evidence. Id. at 676. To prevail on a Brady misconduct claim, the defendant must establish that 1) the material at issue is favorable to the accused; 2) the material was suppressed by the State, either wilfully or inadvertently; and 3) prejudice ensued. Banks v. Dretke, 540 U.S. 668, 691 (2004). We review a district court's denial of a motion for new trial based on Brady violations for abuse of discretion. United States v. Fernandez, 136 F.3d 1434, 1438 (11th Cir. 1998).

We have reviewed the statements and the trial testimony and find no material conflict between the FBI statements of these witnesses and their testimony at trial. Thus, the district court did not err in refusing to grant a new trial on the basis of the alleged Brady violations.

## B.    Jury Instruction On "Willful Blindness"

Murray next asserts that  the trial court erred by instructing the jurors on"willful blindness," arguing that there was no evidence to support an inference of willful blindness.[4]

---

[4] Faller adopts Murray's argument on this point but offers no independent argument.

The knowledge element of a criminal statute may be proved by demonstrating deliberate ignorance. See United States v. Prather, 205 F.3d 1265, 1270 (11th Cir. 2000). The deliberate ignorance instruction provides that "if [a defendant] has his suspicions aroused but then deliberately omits to make further enquiries, because he wishes to remain in ignorance, he is deemed to have knowledge." Id. (quoting United States v. Rivera, 944 F.2d 1563, 1570 (11th Cir.1991)). We review the legal correctness of a jury instruction de novo, but defer on questions of phrasing, absent an abuse of discretion. Id.

Having reviewed this record, we find that the evidence demonstrated that Murray knew that her organization had taken in hundreds of thousands of dollars, and delivered absolutely nothing in return. She had been warned about previous frauds perpetrated by Adam, but, rather than following through on the investigation into his background which she had begun, she terminated that investigation upon Adam's request. Nonetheless, according to the testimony of Colon, who recruited her into the scheme, she continued to assure clients that loans had been funded and never questioned him regarding the legitimacy of the program, or Adam's background. We find this evidence sufficient to support an inference that there was either knowledge that the scheme was fraudulent or a deliberate attempt to remain ignorant of that fact. Under the facts of this case, it cannot be said that the

6

district court erred in giving this instruction.

## C.     Promotional Money Laundering Charge

Third, Murray and Faller argue that the trial court erred in refusing to dismiss their money laundering conspiracy convictions, because the use of money to pay rent and office expenses does not constitute promotional money laundering.

To obtain a conviction on a § 1956(a)(1)(A)(i) promotional money laundering charge, the government must prove: "(1) the defendant conducted or attempted to conduct a financial transaction; (2) the defendant knew the property involved in the transaction represented the proceeds of unlawful activity; (3) the property involved was in fact the proceeds of the specified unlawful activity; and (4) the defendant conducted the financial transaction 'with the intent to promote the carrying on of [the] specified unlawful activity.'" United States v. Carcione, 272 F.3d 1297, 1302 (11th Cir. 2001) (quoting 18 U.S.C. § 1956(a)(1)(A)(i)).

The gravamen of § 1956(a)(1)(A)(i) is the intent to promote the carrying on of the specified unlawful activity.  See id. at 1303; United States v. Miller, 22 F.3d 1075, 1080 (11th Cir. 1994).  The defendants argue correctly that mere proof that a defendant engaged in a transaction with "tainted" money is not enough.[5]  However,

_____

[5] As the courts have noted, the "money laundering statute" must not be turned into a "money spending statute."  See, e.g., United States v. Miles, 360 F.3d 472, 477 (5th Cir. 2004); United States v. Sanders, 928 F.2d 940, 946 (10th Cir. 1991).

the record establishes that the money that Murray and Faller spent on rent, furniture, payroll, travel expenses, and office supplies was integral to creating an impression of legitimacy that would entice their victims to pay the substantial advance fees. Thus, there was sufficient evidence to establish that the money was spent with the intent to promote the fraudulent scheme, and the district court did not err by refusing to dismiss the conviction on this charge.[6]

## D.    Prosecutorial Misconduct

Fourth, Murray and Faller contend that the prosecutor made improper closing remarks that deprived them of a fair trial. Because neither Faller nor Murray raised timely objections, the statements are reviewable only under the plain error standard. United States v. Pendergraft, 297 F.3d 1198, 1204 (11th Cir. 2002). Under the plain error standard, the prosecutor's statements created reversible error only if the statements were plainly wrong, affected the appellants' substantial rights, and seriously affected the fairness, integrity, or public reputation of the judicial proceeding. United States v. Olano, 507 U.S. 725, 732 (1993). Under this

---

[6] The cases Murray cites on the issue of concealment are inapposite. Concealment is a necessary element of money laundering only under § 1956(a)(1)(B) (transactions designed in whole or in part to conceal the nature or source of the proceeds, or to avoid reporting requirements under state or federal law), not under § 1956(a)(1)(A)(i) (transactions with an intent to promote the unlawful activity). Murray and Faller were convicted under the latter. Thus, it is irrelevant to our review whether she spent the money openly, or in a concealed manner.

8

standard, we find no reversible error.[7]

## E.    Cumulative Error

Finally, Faller argues that the cumulative effect of errors at trial deprived him of a fair trial. In support of this claim, he cites the alleged Brady violations and improper closing argument statements discussed above, as well as an excessive pre-trial delay caused by the prosecution, the prosecution's use of material that he contends should have been protected by attorney-client and work-product privilege, and the district court's refusal to present a separate "theory of defense" instruction to the jury on Faller's behalf.

To establish cumulative error, each alleged incident must constitute error in itself, though not necessarily so great as to warrant reversal. United States v. Preciado-Cordobas, 981 F.2d 1206, 1215 n.8 (11th Cir. 1993). As discussed above, we find that there was no Brady error, and that the prosecution's closing statements did not constitute plain error. After reviewing the record, we further find that the trial court did not err in granting a two-and-a-half-year continuance to

---

[7] We note that Faller did contemporaneously object to one of the statements he argues constituted prosecutorial misconduct. However, we find that any impropriety in this comment was harmless, in light of the evidence as a whole and the trial judge's specific direction to the jury before closing arguments that "what the lawyers say is not evidence." See United States v. Barshov, 733 F.2d 842, 847 (11th Cir. 1984).

the prosecution.[8]  Nor did the magistrate judge err in concluding that Faller failed to establish that any materials used by the prosecution were the confidential product of joint defense meetings.  Finally, we find that it was within the district court's discretion to refuse to charge the jury with Faller's requested instruction, because the instruction actually given by the court substantially covered Faller's defense.  See United States v. Gold, 743 F.2d 800, 819 (11th Cir. 1984).

Because Faller has failed to establish that the violations he alleges were indeed errors, they cannot support a cumulative error claim.

## III. CROSS-APPEAL OF SENTENCES

On cross-appeal, the government challenges Murray and Faller's sentences, arguing that the district court erred 1) by failing to hold the defendants responsible for the entire amount of loss caused by the foreseeable acts of others involved in

---

[8] The delay did not amount to either a statutory or constitutional violation of Faller's right to a speedy trial.  The Speedy Trial Act, 18 U.S.C. § 3161 (c)(1), requires that an indicted defendant be brought to trial within 70 days of the date of indictment.  However, in a case involving multiple defendants, the speedy trial period begins to run when the last codefendant is indicted or first appears before a judge or magistrate judge.  Henderson v. United States, 476 U.S. 321, 322 n.2 (1986).  Because Faller's codefendant Adam fought his extradition to the United States, and had not yet appeared before a judge when Faller's trial began, the Speedy Trial time limit never began to run.  Thus, there was no violation of that statute.

Nor is there error with regard to Faller's constitutional speedy trial claim.  The government's attempt to apprehend a codefendant is a constitutionally valid justification for delaying the trial of an available defendant.  United States v. Hayes, 40 F.3d 362, 365 (11th Cir. 1994).  Further, Faller cannot show prejudice.  Faller argues that he was prejudiced by the death of a Joe Denion, a witness who would have testified that Faller hired him in order to close loans (thus proving that Faller believed that loans would be funded).  However, Faller was able to establish through other witnesses that he had hired Denion to close loans.

the jointly undertaken fraud conspiracy, as required by U.S.S.G. § 1B1.3(a)(1)(B); 2) by granting downward departures, since promotional money laundering is within the heartland of money laundering cases; and 3) by failing to rule on the government's PSI objections concerning Murray's role in the offense and Faller's attempts to obstruct justice.

Post-Booker, we continue to review the district court's initial calculation of a defendant's Sentencing Guideline range de novo. United States v. Crawford, 407 F.3d 1174, 1178 (11th Cir. 2005). After the district court has calculated the Guideline range, "the district court may impose a more severe or more lenient sentence as long as the sentence is reasonable." Id. at 1179.

In this case, the district court erred in calculating the amount of foreseeable loss, as required by U.S.S.G. § 1B1.3(a)(1)(B). "In the case of a jointly undertaken criminal activity" such as this one, § 1B1.3(a)(1)(B) requires the judge to calculate loss based on "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." Id.; see also United States v. McCrimmon, 362 F.3d 725, 731 (11th Cir. 2004) ("When determining the loss amount attributable to a particular defendant convicted of a conspiracy offense, the district court must first determine the scope of criminal activity the defendant agreed to jointly undertake, and then consider all reasonably foreseeable acts and

11

omissions of others in the jointly undertaken criminal activity." (internal quotations omitted)). Here, the district court overruled the government's objection to the loss calculation, determining that Colon "controlled" the Ft. Lauderdale office alone, and that he "didn't see that Faller had any involvement in the Connecticut operation or Murray in the Tampa operation" (emphasis added). However, § 1B1.3(a)(1)(B) requires the district court to determine whether these acts of joint undertakers were reasonably foreseeable to Murray and Faller. While we do not decide the factual question ourselves, we recognize that the legal standard of "reasonable foreseeability" of the acts of others does not require direct "control" or "involvement" in those acts. Because the district court appears to have based his findings solely on those latter factors, it erred by failing to apply the correct legal standard. See McCrimmon, 362 F.3d at 728.

The district court also erred by departing downwards to level 17, on the basis that the money laundering in this case, as incident to the primary fraud, was outside the "heartland" of money laundering cases. The district court reasoned that "Congress enacted the money laundering statute to deal with drug dealers who were in the process of laundering money to cover drug proceeds." However, our prior case law has established that money laundering incident to fraud is within the "heartland" of money laundering cases. See United States v. Adams, 74 F.3d

12

1093, 1102 (11th Cir. 1996); United States v. De La Mata, 266 F.3d 1275, 1302 (11th Cir. 2001). The district court erred by failing to determine whether the defendants' conduct in this case falls outside the "heartland" of offenses of money laundering incident to fraud. Our case law similarly prohibits departure on the district court's other stated basis, that of ensuring that the defendants did not receive a greater sentence than a more culpable co-conspirator. See United States v. Chotas, 968 F.2d 1193, 1197-98 (11th Cir. 1992) ("[T]o adjust the sentence of a co-defendant in order to cure an apparently unjustified disparity between defendants in an individual case will simply create another, wholly unwarranted disparity between the defendant receiving the adjustment and all similar offenders in other cases.").

Before the district court judge can address what he or she thinks would be a reasonable sentence, the court must correctly calculate a guideline sentence. Because the district court's calculation of Murray and Faller's guideline sentences was erroneous, we must vacate and remand for re-sentencing.

**AFFIRMED IN PART; VACATED AND REMANDED IN PART.**

13