[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 2, 2005
THOMAS K. KAHN
CLERK

_____

No. 03-15136

_____

D. C. Docket No. 03-00156-CR-1-1

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

CHARLES CRAWFORD JR.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(May 2, 2005)

Before EDMONDSON, Chief Judge, MARCUS and PRYOR, Circuit Judges.

PRYOR, Circuit Judge:

This appeal presents two issues regarding the application of the Sentencing

Guidelines: (1) whether the district court clearly erred when it found that Charles

Crawford Jr. did not engage in more than minimal planning when he participated in a five year scheme that defrauded the government of $434,032 and involved over a hundred separate transactions; and (2) whether the district court erred when it granted a downward departure based on Crawford's restitution and remorse, lack of criminal sophistication, and substantial assistance to the government, and because the loss to the government allegedly overstated Crawford's criminality. Because both the large number of transactions and the deliberate steps Crawford took to complete those transactions compel a finding that Crawford did not merely take advantage of a sudden opportunity, we conclude that the district court clearly erred when it found that Crawford did not engage in more than minimal planning. We further conclude that the district court did not apply the correct legal standards regarding several of the grounds relied upon for departure. We vacate Crawford's sentence and remand this case for resentencing in a manner consistent with the Guidelines both as interpreted in this opinion and the advisory manner explicated in United States v. Booker, 543 U.S. —, 125 S. Ct. 738 (2005).

## I. BACKGROUND

Crawford owned and operated a food store in Atlanta, Georgia, called "Mr. Wick, Jr." A large volume of Crawford's business came from low-income customers who paid for their food with vouchers from the Georgia Women,

Infants, and Children (WIC) supplemental food program. The WIC program, which is administered by state agencies that receive federal grants, assists low-income parents and expectant mothers in obtaining nutrition for their children. Participants in WIC receive vouchers that allow the bearer to purchase food in an amount up to the face value of the voucher, and WIC vendors typically redeem vouchers for an amount less than their face value.

Crawford was approached in 1996 by Edwin Kelley, who offered to sell to Crawford WIC vouchers that Kelley had purchased from residents of public housing projects in Atlanta. Crawford and Kelley agreed that Crawford would pay Kelley for the vouchers in an amount close to the face value of the vouchers, Crawford would then redeem the vouchers, and Kelley would keep 60 percent of the profits and give Crawford 40 percent. Crawford and Kelley engaged in over 100 transactions over a five year period involving vouchers with a total face value of $434,032. The exact number of vouchers that Mr. Wick, Jr. redeemed from the Georgia WIC program is unknown.

In June 2000, an anonymous informant notified the Georgia WIC program of Kelley's activities. An undercover investigation led to Crawford's arrest in October 2002. In a written plea agreement, Crawford pleaded guilty to an information that charged that he, "aided and abetted by others did unlawfully

3

receive, conceal and retain to his own use . . . vouchers with a value of more than One Hundred ($100.00) Dollars, knowing said assets and property to have been willfully misapplied and obtained by fraud." Crawford agreed to forfeit an automobile and $146,092 in a Bank of America bank account and make restitution to the Georgia WIC program in an amount to be determined later.

The probation officer who prepared Crawford's Presentence Investigation Report (PSI) determined that the loss to the Georgia WIC program totaled $434,032 and recommended restitution to that agency. Crawford did not dispute these aspects of the PSI. The PSI also recommended that Crawford receive a two level enhancement in his offense level for "more than minimal planning," under United States Sentencing Guideline section 2F1.1(b)(2)(A) & (B). At the sentencing hearing, Crawford objected to the more than minimal planning enhancement and contended that, on each occasion, he took advantage of a sudden opportunity when Kelley offered to sell him WIC vouchers. Crawford also moved for a downward departure based on several factors, including the extent of his restitution and his alleged lack of criminal sophistication.

The district court refused to apply the more than minimal planning enhancement. The district court found that, in each of the more than one hundred transactions with Kelley, Crawford "took advantage of a situation and the

opportunity presented." Crawford "never tried to conceal the offense, nor was he the one to start [the] scheme . . . ." In addition, the district court granted Crawford's motion for a downward departure and reduced Crawford's offense level by four. In its order granting the downward departure, the district court stated that Crawford's case fell "outside the heartland of other such cases" and that "all of the grounds taken as a whole warrant downward departure." The district court then sentenced Crawford to 60 months' probation and ordered Crawford to make $434,032 in restitution to the Georgia WIC program. The government appeals both the denial of the more than minimal planning enhancement and the downward departure.

## II. STANDARD OF REVIEW

The resolution of this appeal requires the application of two standards of review. First, a finding by a district court of no minimal planning is a question of fact that we review for clear error. United States v. Ward, 222 F.3d 909, 910 (11th Cir. 2000). We cannot find clear error unless "we are left with a definite and firm conviction that a mistake has been committed." Glassroth v. Moore, 335 F.3d 1282, 1292 (11th Cir. 2003) (citation and quotation marks omitted). Although the clear error standard is "purposefully deferential to the district court, we are not required to rubber stamp the district court's findings simply because they were

entered." McLennan v. Am. Eurocopter Corp., Inc., 245 F.3d 403, 409 (5th Cir. 2001). Review for clear error "does not mean no review." United States v. Pace, 898 F.2d 1218, 1227 (7th Cir. 1990), cert. denied sub nom. Cialoni v. United States, 497 U.S. 1030, 110 S. Ct. 3286 (1990).

The second standard of review is not deferential. "We review questions of law arising under the Sentencing Guidelines de novo." United States v. Bush, 126 F.3d 1298, 1299 (11th Cir. 1997) (per curiam). Whether a factor is a permissible ground for a downward departure from the Sentencing Guidelines is a question of law. United States v. Kim, 364 F.3d 1235, 1239-40 (11th Cir. 2004).

This appeal does not raise any issue of a violation of the Sixth Amendment, as explicated in Booker, nor does either party raise any issue of the application of the Guidelines in a mandatory, rather than advisory, fashion. Because of the fundamental change in sentencing appeals effected by Booker, we must determine whether our pre-Booker standards for reviewing application of the Sentencing Guidelines still apply. We agree with the Fifth Circuit that Booker does not alter our review of the application of the Guidelines. See United States v. Villegas, — F.3d —, 2005 WL 627963 at *4-5 (5th Cir. Mar. 17, 2005). Although Booker established a "reasonableness" standard for the sentence finally imposed on a defendant, 543 U.S. at —, 125 S. Ct. at 765, the Supreme Court concluded in

6

Booker that district courts must still consider the Guidelines in determining a defendant's sentence. Id. at —, 125 S. Ct. at 764-65. Nothing in Booker suggests that a reasonableness standard should govern review of the interpretation and application as advisory of the Guidelines by a district court. See Villegas, — F.3d at —, 2005 WL 627963 at *4. Booker did not affect 18 U.S.C. section 3742(f), which mandates remand of any case in which the sentence "was imposed as a result of an incorrect application of the sentencing guidelines . . . ." Id. at —, 2005 WL 627963 at *5.

Although under Booker, the Sentencing Guidelines are an advisory rather than a mandatory regime, the district court remains obliged to "consult" and "take into account" the Guidelines in sentencing:

> Without the "mandatory" provision, the Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals. See 18 U.S.C.A. § 3553(a) (Supp. 2004). The Act nonetheless requires judges to consider the Guidelines "sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant," § 3553(a)(4), the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims, §§ 3553(a)(1), (3), (5)-(7) (main ed. and Supp. 2004). And the Act nonetheless requires judges to impose sentences that reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and effectively provide the defendant with needed educational or vocational training and medical care. § 3553(a)(2) (main ed. and Supp. 2004).

7

Booker, 543 U.S. at —, 125 S. Ct. at 764-65.  In short, after Booker, "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."  Id. at —, 125 S. Ct. at 767.

This consultation requirement, at a minimum, obliges the district court to calculate correctly the sentencing range prescribed by the Guidelines:

> After Booker, the Federal Sentencing Guidelines remain an essential consideration in the imposition of federal sentences, albeit along with the factors in § 3553(a).  A sentencing court under Booker still must consider the Guidelines, and, such consideration necessarily requires the sentencing court to calculate the Guidelines sentencing range in the same manner as before Booker.

United States v. Shelton, 400 F.3d 1325, 1332 n.9 (11th Cir. 2005).  In other words, as was the case before Booker, the district court must calculate the Guidelines range accurately.  A misinterpretation of the Guidelines by a district court "effectively means that [the district court] has not properly consulted the Guidelines . . . ."  United States v. Hazelwood, 398 F.3d 792, 801 (6th Cir. 2005); accord Villegas, — F.3d at —, 2005 WL 627963 at *7 ("Although the district court on remand is not bound by the Guidelines, it must consider them, and in doing so, it ordinarily is required to calculate the proper Guidelines range.").  After it has made this calculation, the district court may impose a more severe or more lenient sentence as long as the sentence is reasonable, see Booker, 543 U.S.

8

at —, 125 S. Ct. at 767 ("The courts of appeals review sentencing decisions for unreasonableness."), but the requirement of consultation itself is inescapable.

## III. DISCUSSION

Both of the sentencing decisions of the district court were erroneous. The district court ignored the startling number of transactions between Crawford and Kelley over a five-year period and Crawford's actions in maintaining the scheme when it refused to apply the more than minimal planning enhancement. The district court also misapplied the Sentencing Guidelines when it granted the downward departure. We address each sentencing error in turn.

### A. More than Minimal Planning

Section 2F1.1(b)(2)(A) of the Sentencing Guidelines (2000 edition) mandates a two-level increase in the offense level for a defendant who has engaged in "more than minimal planning" for the commission of the offense. The commentary to the application instructions in section 1B1.1 explains that this enhancement involves serial behavior especially in financial crimes:

> "More than minimal planning" means more planning than is typical for commission of the offense in a simple form. "More than minimal planning" also exists if significant affirmative steps were taken to conceal the offense. . . .

> "More than minimal planning" is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance

9

was purely opportune. Consequently, this adjustment will apply especially frequently in property offenses.

In a theft, going to a secluded area of a store to conceal the stolen item in one's pocket would not alone constitute more than minimal planning. However, repeated instances of such thefts on several occasions would constitute more than minimal planning. . . .

In an embezzlement, a single taking accomplished by a false book entry would constitute only minimal planning. On the other hand, creating purchase orders to, and invoices from, a dummy corporation for merchandise that was never delivered would constitute more than minimal planning, as would several instances of taking money, each accompanied by false entries.

U.S.S.G. § 1B1.1 cmt. n.1(f). "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." Stinson v. United States, 508 U.S. 36, 38, 113 S. Ct. 1913, 1915 (1993).

The inquiry for more than minimal planning is not limited to the elements of a particular offense or the completion of the offense itself. A series of acts "that together constitute a single offense under a particular criminal statute does not thereby cease to be a series of acts under the 'more than minimal planning' guideline . . .; such repeated acts indicate greater culpability and are in fact the target of the 'more than minimal planning' enhancement." Bush, 126 F.3d at 1300

10

n.1.  We have, for example, rejected an argument that "three separate instances of embezzlement should be deemed to be a single act for purposes of the 'more than minimal planning' guideline, because the separate instances of embezzlement constitute one 'offense.'"  Id.  The enhancement requires "a more holistic view" of the defendant's conduct "in light of the entire scheme . . . engaged in by [the defendant] in order to commit the offense."  United States v. Duclos, 214 F.3d 27, 32 (1st Cir. 2000).

If the government proves that an offense involved repeated acts over a period of time, more than minimal planning is "deemed present."  U.S.S.G. § 1B1.1 cmt. n.1(f).  Put another way, a presumption of more than minimal planning arises whenever repeated acts over a period of time are proved.  That presumption can be rebutted, however, if it is clear that each instance was "purely opportune."  If, for example, several fraudulent transactions occur over a period of two years, more than minimal planning will be deemed present unless it is clear that each one of the several transactions was purely opportune.  Cf. United States v. McCoy, 242 F.3d 399, 405 n.10 (D.C. Cir. 2001).

The enhancement for more than minimal planning is an acknowledgment that "purposeful criminal conduct demands greater punishment" than conduct undertaken without "the opportunity to consider the criminality of [the] act and its

11

consequences." United States v. Scroggins, 880 F.2d 1204, 1213 (11th Cir. 1989). Planning for a particular offense or engaging in acts to conceal the offense evidences an awareness that the actions are criminal and a disregard for the harmful consequences of those actions. The presumption of more than minimal planning for repeated acts is a reflection of common sense. Serial behavior of a criminal evidences his deliberation despite a lack of direct evidence of his mental operations. See Bush, 126 F.3d at 1300.

The exception to this rule is narrow. "Purely opportune" means "spur of the moment" conduct, in response "to a sudden, fortuitous opportunity of which the defendant took advantage without deliberation." McCoy, 242 F.3d at 405 (citations omitted); see also United States v. Rust, 976 F.2d 55, 57 (1st Cir. 1992); United States v. Monaco, 23 F.3d 793, 797-98 (3d Cir. 1994); United States v. Lutz, 154 F.3d 581, 590 (6th Cir. 1998). The exception of purely opportune conduct from the more than minimal planning enhancement reflects the lesser culpability of defendants who have not knowingly considered the consequences of their actions. Cf. Bush, 126 F.3d at 1300 n.1.

The exception also requires a close temporal relation between a fortuitous opportunity and an act that takes advantage of the opportunity. A delay between the opportunity and the act makes it unlikely that the conduct was impulsive,

12

because delay allows time for thought; deliberate action is "slow, unhurried, and steady as though allowing time for decision on each individual action involved." Merriam-Webster's Collegiate Dictionary 304 (10th ed. 2001). Direct evidence that the defendant deliberated about or planned his actions before he took advantage of an opportunity will also negate the inference. See McCoy, 242 F.3d at 405. The exception for purely opportune conduct will not apply unless each repeated act was undertaken impulsively and without deliberation.

The district court found that each of the over 100 instances in which Crawford bought vouchers from Kelley was purely opportune. That determination was clearly erroneous. The sheer number of transactions alone makes it highly unlikely that each transaction was purely opportune. Crawford wrote 184 checks to Kelley between April 12, 1996, and March 22, 2001, totaling $434,032. Crawford's counsel asserted at the sentencing hearing that "each and every time [Kelley sold WIC vouchers to Crawford] Mr. Crawford thought it was the last time," but that assertion, although incredible, misses the point.

Over nearly five years, Crawford had many opportunities to consider the consequences of his actions, yet he did not voluntarily cease his participation in the scheme. On 184 occasions, Crawford wrote Kelley checks for the WIC vouchers. After he cashed or deposited the checks, Kelley returned to the store

13

with the 40 percent share he owed Crawford. That delay in the receipt of his share gave Crawford time to consider his actions. Crawford also had the opportunity to deliberate whether to redeem the WIC vouchers. That delay presented yet another opportunity for Crawford to consider the significance and illegality of his conduct. Crawford's receipt, concealment, and retention for his own use of fraudulently obtained WIC vouchers to defraud the WIC program of $434,032 cannot be called "spur of the moment conduct, in response to a sudden, fortuitous opportunity of which [Crawford] took advantage without deliberation." McCoy, 242 F.3d at 405 (citations omitted). The district court clearly erred when it determined that Crawford did not engage in more than minimal planning.

### B. Downward Departure

At his sentencing hearing, Crawford asserted several grounds for a downward departure from his applicable guideline range. Crawford first contended that although he made $140,000 from the voucher scheme, he turned over roughly $200,000 plus the proceeds of the sale of his store to the government. Crawford argued that he was thus eligible for a departure based on extraordinary acceptance of responsibility and extraordinary remorse. Crawford also sought a departure on three other grounds: (1) lack of criminal sophistication, because he paid Kelley by easily-traced checks instead of cash; (2) assistance to the

14

government, even though the government did not file a substantial assistance motion; and (3) that the amount of loss overstated Crawford's criminality and took his case outside the heartland of similar cases. Crawford argued that all of these factors, along with the extraordinary remorse factor, could be combined to justify an offense level that would allow probation.

The district court granted a downward departure and held that "all of the grounds taken as a whole warrant a downward departure" because the case fell "outside the heartland of other such cases." The district court based its decision on " a combination of factors" but emphasized Crawford's testimony at the sentencing hearing and Crawford's donation to the government of the proceeds from the sale of his business. After the downward departure, Crawford's guideline range was 0-6 months, and the district court sentenced Crawford to 60 months' probation and ordered him to pay $434,032 in restitution.

Several of the grounds relied upon by the district court were impermissible grounds for a departure in calculating the advisory guideline range. Each of those errors rested on a misunderstanding of the law. Because the district court relied upon a "combination of factors" to justify the downward departure, we cannot presume that the district court would have granted the downward departure in the absence of those errors. To guide the district court on remand in its calculation of

15

an advisory guideline range, we address each factor in turn.

### 1. Extraordinary Remorse and Restitution

We have recently held that extraordinary remorse and restitution is a discouraged but not prohibited ground for a downward departure. Kim, 364 F.3d at 1240-41. In Kim, we rejected the interpretation proposed by the government that would have deemed restitution involuntary if it is not done before the initiation of criminal proceedings. Id. at 1242 n.9, 1243. We instead adopted a test that considers the degree of voluntariness, the lengths to which the defendant went to make restitution, the percentage of funds restored, the timing of the restitution, and whether the defendant's motive showed sincere remorse and acceptance of responsibility. Id. at 1244-45.

The district court did not have the benefit of the Kim decision when it made its ruling that granted the downward departure. Although the district court was permitted to apply a departure for extraordinary remorse in some circumstances, the record does not allow us to speculate as to how the district court would have weighed all of the Kim factors. On remand, the district court must apply the Kim test when it considers, in its calculation of an advisory guideline range, whether to apply a downward departure based on this factor.

### 2. Lack of Criminal Sophistication

16

Section 2F1.1 of the Guidelines contains a two-level specific offense level characteristic for offenses committed using extraordinary means. That enhancement penalizes the use of sophisticated means, not the use of unsophisticated means. See United States v. Schlaen, 300 F.3d 1313, 1319 (11th Cir. 2002), cert. denied, 540 U.S. 853, 124 S. Ct. 140 (2003). A defendant who uses unsophisticated means is not to be rewarded for lack of imagination, but instead avoids the enhancement. Id. Lack of criminal sophistication is not a permissible ground for a downward departure in calculating an advisory guideline range.

### 3. Substantial Assistance to the Government

The Guidelines allow for a downward departure "[u]pon motion of the government" if the defendant provided substantial assistance to the government. U.S.S.G. § 5K1.1. A sentencing court cannot depart from an advisory guideline range absent a motion from the government. United States v. Forney, 9 F.3d 1492, 1499 (11th Cir. 1993). Because the government did not file a substantial assistance motion, any assistance Crawford might have provided the government was not a permissible ground for a downward departure in calculating an advisory guideline range.

### 4. Loss Amount Overstated Criminality

17

The commentary to the Guidelines provides that, in a few instances, the amount of loss calculated under the Guidelines may overstate the seriousness of the offense. U.S.S.G. § 2F1.1 cmt. n.11. If so, a downward departure can be applied. Id. The example given is when a defendant attempts to pass a negotiable instrument so obviously fraudulent that no one would seriously consider honoring it. Id. The example suggests that this departure typically applies in cases where there is no meaningful chance that the attempted crime would have succeeded to the extent indicated by the stated loss. See, e.g., United States v. LeRose, 219 F.3d 335, 339 (4th Cir. 2000).

Unlike the other factors relied upon by the district court to justify the downward departure, the reliance on this factor by the district court was not necessarily legally erroneous. This factor can be, in some circumstances, a permissible ground for a downward departure. Because the other downward departure errors require us to vacate Crawford's sentence, we do not decide whether the district court justifiably relied on this factor. We note, however, that the amount of loss appears proportionate to the criminal acts committed by Crawford. Cf. id.

### 5. Summary

The district court committed several legal errors in its decision that a

downward departure was warranted. We cannot presume that, in the absence of those errors, the district court would have decided that a downward departure was warranted in calculating an advisory guideline range. We remand this case to allow the district court to revisit the downward departure issue under the correct legal standards.

## IV. CONCLUSION

The district court clearly erred when it refused to apply the more than minimal planning enhancement. The district court also made several errors in its interpretation of the Guidelines that led to the downward departure. Because district courts are required under <u>Booker</u> to consult the Guidelines, and because true consultation cannot be based on an erroneous understanding of the Guidelines, the district court erred in failing to consult properly the Guidelines. We, therefore, vacate Crawford's sentence and remand this case to the district court for resentencing. On remand, the district court must calculate an advisory guideline range that includes the more than minimal planning enhancement and considers whether to grant a downward departure from that advisory guideline range consistent with this opinion.

**VACATED AND REMANDED.**

EDMONDSON, Chief Judge, concurs in the result that the sentence should be vacated and the case remanded for resentencing.