**[DO NOT PUBLISH]**

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 28, 2005
THOMAS K. KAHN
CLERK

_____

**No. 05-10995**
**Non-Argument Calendar**

_____

D. C. Docket No. 02-00147-CR-ORL-22-KRS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

THAD RYAN ROBERTS,
a.k.a. Orb Robinson,

Defendant-Appellant.

_____

**Appeal from the United States District Court**
**for the Middle District of Florida**

_____

**(November 28, 2005)**

Before CARNES, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Thad Ryan Roberts appeals his total 90-month sentence following resentencing for conspiracy to steal and sell government property and to transport stolen goods valued at $5,000 or more, in violation of 18 U.S.C. § 371; transportation of stolen goods valued at $5,000 or more, in violation of 18 U.S.C. § 2314; and possession of stolen U.S. property, in violation of 18 U.S.C. § 641.[1] Roberts argues on appeal that the district court's eight-level upward departure, pursuant to U.S.S.G. § 5K2.7, based on a significant disruption of governmental function,[2] was unreasonable. For the reasons set forth more fully below, we affirm.

According to the presentence investigation report ("PSI"), Roberts had participated in a criminal scheme, whereby he and several co-conspirators stole lunar samples and Martian meteorites from the National Aeronautics and Space Administration's ("NASA's") Johnson Space Center in Houston and transported these items in interstate commerce for the purpose of selling them and using the sale proceeds for their own enrichment. During the course of the conspiracy,

---

[1] Roberts pled guilty, in Case No. 6:02-cr-147, to conspiracy to steal and sell government property and to transporting stolen goods valued at $5,000 or more, in violation of 18 U.S.C. § 371 (Count 1); and transportation of stolen goods valued at $5,000 or more, in violation of 18 U.S.C. § 2314 (Count 2). Roberts also pled guilty, in Case No. 6:03-cr-150, to possession of stolen U.S. property, in violation of 18 U.S.C. § 641, and this case was consolidated with Case No. 6:02-cr-147, for purposes of sentencing.

[2] The United States Sentencing Guidelines ("federal guidelines") authorize a district court to depart from a defendant's applicable guideline range "[i]f the defendant's conduct resulted in a significant disruption of a governmental function." See U.S.S.G. § 5K2.7.

Roberts and some of his co-conspirators stole a 600-pound safe containing "lunar samples from every Apollo mission that landed on the moon, documentation authenticating the lunar samples, Martian meteorites, and other items from NASA/JSC." After transporting the lunar samples and meteorites to Florida to sell them to purported buyers, Roberts was arrested by undercover FBI agents who had been posing as the buyers. Additionally, in an unrelated case, Roberts, while working as an intern for the paleontologist department of the Utah Museum of Natural History, had possessed in his residence several items of stolen U.S. property, including dinosaur remains and other vertebrate specimens that belonged to the U.S. Bureau of Land Management, the National Forest Service, and the National Park Service.

The probation officer preparing the PSI recommended a base offense level of 6, pursuant to U.S.S.G. § 2B1.1(a), and an 18-level enhancement under § 2B1.1(b)(1)(J), based on the amount of loss to which both parties had stipulated, i.e., $6,987,002. The probation officer also recommended a two-level enhancement under U.S.S.G. § 3B1.1(c), based on Roberts's leadership role in the offense, and a three-level reduction under U.S.S.G. § 3E1.1, for acceptance of responsibility. With a total offense level of 23 and criminal history category I, Roberts's resulting guideline range was 46 to 57 months' imprisonment. Also

prior to sentencing, the district court conducted a hearing, during which it told the parties that it was considering an upward departure under U.S.S.G. § 5K2.7.

At sentencing, the court adopted the probation officer's findings and guideline calculations. The court then stated that, using as a guide the loss range set forth in § 2B1.1(b)(1)(N), it intended to depart upwards eight levels, pursuant to § 5K2.7, based on the court's finding that Roberts's offense had significantly disrupted a government function.[3] In explaining its reasoning, the court stated:

> Doctor Gibson's testimony at [sic] the trial in this case [of Robert's co-conspirator] was heart wrenching. All the work that he had done that was just for naught because Mr. Roberts decided to steal not only the lunar samples, but all of his scientific work that had been written in notebooks, and these were national treasures that are priceless. And the [c]ourt feels that it's appropriate to grant or to impose an upward departure of eight levels to get to the top of the loss range because that still does not come anywhere near giving the public the kind of punishment that should be given for [] such a loss. . . . Doctor Gibson can never go back and get his notes and they can't use the rocks for the same educational and scientific uses they had before because they're now worthless.[4]

The court further stated that Dr. Gibson currently had not located his notebooks,

---

[3] Section 2B1.1(b)(1)(N) provides for a 26-level increase if the amount of loss was greater than $100,000,000. See U.S.S.G. § 2B1.1(b)(1)(N). As discussed above, Roberts received an 18-level enhancement under § 2B1.1(b)(1)(J), based on a stipulated loss amount of $6,987,002. See U.S.S.G. § 2B1.1(b)(1)(J) (providing for an 18-level increase for offenses involves more than $2,500,000, and less that $7,000,000 in loss).

[4] Dr. Everett Gibson is a senior scientist, astrobiologist, and geochemist for NASA/JSA, whose duties include, among other things, researching extraterrestrial materials and operating a NASA laboratory.

and that "that's a very significant disruption to his work."

After Roberts objected to the court's finding that his offenses had significantly disrupted a governmental function, the court overruled this objection and upwardly departed eight levels, again stating that an eight-level increase was appropriate because "these are priceless national treasures and that's the top of the range." The court then granted Roberts a one-level reduction for substantial assistance, which resulted in a new guidelines range of 97 to 121 months' imprisonment. Thereafter, the court sentenced Roberts in Case No. 6:02-cr-147 to 60 months' imprisonment on Count One and a concurrent 100-month sentence on Count Two. In Case No. 6:03-cr-150, the court sentenced Roberts to 46 months' imprisonment to run concurrent to the sentenced imposed in Case No. 6:02-cr-147.

On first appeal, Roberts had argued that (1) the district court's finding that the offense significantly disrupted a governmental function was unsupported by the record, (2) the court erred in failing to articulate its reasons for the departure in its written order of judgment, and (3) the extent of the court's departure was unreasonable. We vacated and remanded Roberts's sentences, based on our determination that the record did not support the district court's finding that Roberts's conduct had caused a significant disruption of a governmental function. We explained that the record did not reflect that (1) the theft of Dr. Gibson's

5

notebooks rendered his past work meaningless, and (2) the theft of the lunar samples resulted in these samples being worthless. We also determined that Roberts's remaining claims were moot.

On February 11, 2005, at resentencing, the court again found that Roberts pre-departure had a total offense level of 23 and a criminal history category of I, resulting in a guideline range of 46 to 57 months' imprisonment. Dr. Gibson then offered the following testimony. Although Dr. Gibson had received his last funding for lunar sample research, and although his term as a lunar-sample principle investigator ended in the late 1980s, he had continued to perform research on lunar samples, independently and in collaboration with his colleagues, and he had published the results of that research, with his latest publication being in 1991. Moreover, with scientific interest in the Martian meteorite material increasing in the early 1990s, Dr. Gibson had studied Martian materials extensively, with the goal of understanding the nature of the materials' biogenic elements. In 1996, after Dr. Gibson had published the research results from his study of Martian samples, which revealed possible biogenic process on Mars, his funding for Martian research increased.

Dr. Gibson also clarified that the lunar samples that Roberts had stolen from the safe had been separated into containers that had been cleaned to "curatorial

standards," meaning that, although all of the samples had been contaminated to some degree by their exposure to the earth's atmosphere, the amount of carbon in the curatorial samples was less than one part per million.[5] Dr. Gibson believed that all of the lunar samples from his safe had been recovered, but that some of the pristine lunar samples had been mixed with those samples that previously had been degraded or used during research.[6] In addition, although some of the Martian meteorites had been recovered, the majority of these samples had been stored in a desiccator inside the safe, and neither these samples nor the desiccator had been recovered after the theft.

Dr. Gibson testified, as well, that the theft of the lunar samples, the Martian meteorites, and his notebooks had resulted in a break in the chain of custody for each sample, such that either the samples no longer had the same value to scientists for research purposes, or Dr. Gibson and other NASA personnel had to spend "an unbelievable amount of time" reconstructing their records to document the NASA

---

[5] Dr. Gibson testified that approximately 800 pounds of lunar material had been returned to Earth, that the NASA lunar curator had maintained approximately 75 to 80-per-cent of this material in an atmospherically controlled environment, and that Dr. Gibson had been allocated between 200 to 300 grams of lunar samples.

[6] Dr. Gibson explained that he had recorded in notebooks the chain of custody for each sample in his possession, including for each samples its weight, the research he had completed, the weight of the amount lost, consumed, or degraded during research, and the weight of the pristine amount remaining after research. Because these notebooks had not been recovered after the theft, Dr. Gibson could not testify with certainty that all of the lunar samples had been recovered.

7

curatorial chain or custody. Because these notebooks also contained information about research that Dr. Gibson had conducted on unique lunar samples, some of the research had not been published elsewhere and could not be replicated. Moreover, due to the theft of the Martian meteorites, NASA had been unable to complete a funded study, NASA scientists and scientists at other institutions had not completed cooperative research projects that required the study of Martian meteorites, and peer review groups who approved research funding had reduced funding to NASA for future research projects.[7] Since October 2003, his laboratory had lost $200,000 in funding.

Additionally, Dr. Gibson stated that, due to this loss of funding, he had to devote substantial time to securing new research samples and funding. Dr. Gibson and other NASA personnel also had to devote approximately three to four months to the investigation of the theft and preparing for Roberts's co-conspirator's trial. Moreover, NASA had curtailed its display of samples for public viewing to avoid future thefts, along with questioning the value of future internships.[8]

---

[7] Although Dr. Gibson requested that the government return the Martian meteorites to him so that he could continue his research, the government responded that the samples could not be returned until after Roberts and his co-conspirators had been sentenced.

[8] Dr. Gibson, however, conceded that he did not manage the internship program, and that he still had a part-time graduate student intern working in his laboratory.

At the conclusion of the evidence,[9] the court determined that the government had established that the theft had caused a significant disruption to NASA, and that this disruption warranted an eight-level upward departure under § 5K2.7. The court explained during the sentencing hearing, and in a written sentencing memorandum, that the significant disruption had included (1) the loss of research time and funding; (2) the damage to the reputation of NASA's internship program; (3) the curtailment of NASA's public outreach program due to the fear that samples would be stolen; (4) the destruction of the samples' chain of custody; (5) the amount of time scientists spent reinstating the NASA curatorial chain; (6) the unavailability of samples for research projects for which samples had been allocated; (7) the loss of Dr. Gibson's notebooks, which had included unpublished historical details of the samples; and (8) the tarnishing of NASA's reputation.

The court also stated during sentencing that the departure was warranted to deter similar criminal conduct. Moreover, in its sentencing memorandum, the court clarified that it had increased Roberts's sentence to correspond with the top of the loss range for his offenses of conviction because the stipulated loss range in § 2B1.1(b)(1)(J), reflected only the tangible loss amount. After departing upwards

---

[9] In addition to Dr. Gibson's testimony, Roberts testified that, among other things, he had attempted during the theft not to damage the extraterrestrial materials, and he had not removed the notebooks.

eight levels from Roberts's guideline range of 46 to 57 months' imprisonment, pursuant to § 5K2.7, and downwards two levels, pursuant to § 5K1.1, based on Roberts's testimony in his co-conspirator's case, the court determined that Roberts's resulting guideline range was 87 to 108 months' imprisonment. The court, thereafter, resentenced Roberts, in Case No. 6:02-cr-147, to concurrent sentences of 60 months' imprisonment on Count One and 90 months imprisonment on Count Two. Moreover, in Case No. 6:03-cr-150, the court again sentenced Roberts to 46 months' imprisonment to run concurrent to the sentenced imposed in Case No. 6:02-cr-147.

On appeal, Roberts concedes that "the court was justified in considering an upward departure of some extent."[10] Roberts, however, argues that the court's eight-level upward departure under § 5K2.7, which resulted in Roberts receiving a sentence that was "nearly double" his presumptive guideline range, was unreasonable. Roberts contends in support that the record did not demonstrate any significant impact of the theft on (1) Dr. Gibson's research of lunar samples, or (2) NASA's (i) internship program, (ii) public display of lunar or Martian

---

[10] Because, unlike in Roberts's appeal of his first sentence, he has explicitly conceded in the instant appeal that the district court was justified in departing to some extent under § 5K2.7, he has abandoned our review of any arguments as to the applicability of this guideline enhancement. See United States v. Dockery, 401 F.3d 1261, 1262-63 (11th Cir. 2005) (holding that "issues and contentions not timely raised in the briefs are deemed abandoned").

materials, or (iii) public reputation. Roberts also contends that, although the theft arguably did impact significantly Dr. Gibson's research on the Martian meteorites, the court failed to consider that this research still could be conducted in the future. Roberts argues that, to the extent the court analogized the amount of disruption to a monetary loss under § 2B1.1(b)(1)(N), the court overstated the "value" of the combined impact of the disruptions from the theft. Finally, Roberts contends that the court's rationale, that the extent of departure was necessary to deter future illegal conduct, was illogical because a person in Robert's position would not likely be influenced substantially by the additional prison term.

Prior to the Supreme Court's decision in United States v. Booker, 543 U.S. ___, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), we reviewed the extent of departures from the mandatory federal guidelines for reasonableness. United States v. Winingear, 422 F.3d 1241, 1246 (11th Cir. 2005). Under that review, we were required "to determine whether the sentence imposed by the district court was reasonable in the context of the factors outlined in [18 U.S.C. § 3553(a)]."[11] Id. at

---

[11] The factors enumerated in § 3553(a) include: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed–(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for . . . (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .; (5) any pertinent policy

11

1246; see also United States v. Blas, 360 F.3d 1268, 1274 (11th Cir. 2004) (explaining that the reviewing court must determine the reasonableness of a departure in light of the § 3553(a) factors and the reasons the district court provided for departing). Post-Booker, "these factors continue to guide our review." Winingear, 422 F.3d at 1246.

Additionally, post-Booker, district courts, while not bound by the federal guidelines, must continue to consult the provisions of the federal guidelines and consider them in sentencing. United States v. Crawford, 407 F.3d 1174, 1178 (11th Cir. 2005). "This consultation requirement, at a minimum, obliges the district court to calculate correctly the sentencing range prescribed by the [federal guidelines]." Id. (emphasis in original). "A misinterpretation of the [federal guidelines] by a district court effectively means that the district court has not properly consulted the [federal guidelines]." Id. at 1179 (quotation marks, citations, and punctuation omitted). Furthermore, "application of the guidelines is not complete until the departures, if any, that are warranted are appropriately considered." United States v. Jordi, 418 F.3d 1212, 1215 (11th Cir. 2005).

In United States v. Melvin, 187 F.3d 1316 (11th Cir. 1999), we reviewed a

---

statement []; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense." See 18 U.S.C. § 3553(a)(1)-(7).

challenge to the reasonableness of a 15-level upward departure, pursuant to U.S.S.G. § 5K2.0, which was based on the number, and vulnerability, of hospitalized children who were indirect victims of the defendant's fraudulent credit-card scheme.  See id. at 1321-24.  We cautioned that "it is the prerogative of the district court, not the court of appeals, to determine, in the first instance, the sentence that should be imposed in light of certain factors properly considered under the Guidelines," and that "[i]t is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence."  See id. at 1323 (internal quotations and marks omitted). We then concluded that, in light of the district court's findings regarding the reprehensible nature of the offense, and the fact that the defendant's ultimate sentence of 120 months' imprisonment was below his statutory maximum sentence of 300 months' imprisonment, his sentence was reasonable.  See id. at 1323-24.

In the instant case, Dr. Gibson conceded that his studies of lunar samples had declined by the early 1990s, and that he only had been allocated 200 to 300 grams of the approximately 800 pounds of lunar material that had been returned to Earth.  However, Dr. Gibson also testified that he could not be certain that all of the samples had been returned, and that research outlined in lost notebooks involving unique lunar samples had not been published elsewhere and could not be

13

replicated in the future. Moreover, regardless of whether the lunar samples were degraded, the break in their chain of custody rendered them less valuable.

In addition to discussing the impact of the offenses on the lunar samples, Dr. Gibson testified that, due to the theft of the Martian meteorites, which he still was studying, he and other scientists had been unable to complete funded studies. Since October 2003, Dr. Gibson's laboratory had lost $200,000 in funding. Martian meteorite samples either had diminished in value, or Dr. Gibson and other NASA personnel had been forced to spend a significant amount of time reconstructing their records to document the NASA curatorial chain of custody. Furthermore, Dr. Gibson and other NASA personnel had been forced to devote several months to (1) the investigation of the theft, and (2) preparing for Roberts's co-conspirator's trial. Roberts also offered no evidence challenging Dr. Gibson's testimony that NASA had curtailed its display of samples for public viewing and had at least questioned the value of future internships.

The court's statement, that the departure was warranted to deter similar criminal conduct, was supported by the fact that Roberts's concurrent sentences in the instant case had resulted from his repeated acts of stealing national treasures. Additionally, to the extent Roberts's appeal also can be construed as arguing that the court improperly analogized to § 2B1.1(b)(1)(N), because the court took loss

14

amount into account when calculating Roberts's offense level, the court's analogy rested on its determination that a significant degree of loss to the NASA program could not be quantified, and this determination of loss, absent a lack of support in the record, should not be recalculated by us, see Melvin, 187 F.3d 1316; see also United States v. Regueiro, 240 F.3d 1321, 1325 (11th Cir. 2001) (concluding that the court's repeated reference to the amount of money that the government lost to the defendant's scheme was only intended to stress the scope and nature of the defendant's fraud and the substantial affect that it had on the Medicare program).

Thus, the court's stated reasons for departing upwards eight levels from Roberts's total offense level of 23 were supported by the record, and they reflected that the court considered the factors enumerated in § 3553(a). See Winingear, 422 F.3d at 1246.[12] Finally, similar to the defendant in Melvin, Roberts's total sentence of 90 months' imprisonment, did not exceed his maximum statutory sentences of 10 years' imprisonment for both Count 2 of Case No. 6:02-cr-147 and Count 1 of Case No. 6:03-cr-150. See 18 U.S.C. §§ 2314 & 641 (setting maximum statutory sentences as 10 years' imprisonment).

Accordingly, we conclude that the district court's eight-level upward

---

[12] We recently concluded that "nothing in Booker or elsewhere requires the district court to state on the record that it has explicitly considered each of the § 3553(a) factors." See United States v. Scott, No. 05-11843, manuscript op. at 11-12 (11th Cir. Sept. 27, 2005).

departure under § 5K2.7 was reasonable.  We, therefore, affirm.

**AFFIRMED.**