UNITED STATES of America,
Plaintiff,

v.

Alexander GIL–RODRIGUEZ and Luis
Manuel Toboada–Cabrera,
Defendants.

No. 05–10028CRMOORE.

United States District Court,
S.D. Florida.

March 27, 2006.

Dana O. Washington, Assistant United States Attorney, United States Attorneys Office, Miami, FL, for Plaintiff.

Steven Edward Amster, Esq., Miami, FL, of Each Defendant.

### SENTENCING ORDER

K. MICHAEL MOORE, District Judge.

THIS CAUSE came before the Court upon the Court's sentencing of the Defendants Alexander Gil–Rodriguez (DE # 31) and Luis Manuel Toboada–Cabrera (DE # 29). The sentencing was held on March 20, 2006.

UPON CONSIDERATION of the PSI and the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order:

### BACKGROUND [1]

On October 12, 2004, the United States Coast Guard (USCG) Sector Key West

1. These facts are derived from the Pre–Sentence Investigation Report prepared for this

received information that a go-fast vessel had departed Cuba and was traveling northbound toward the United States. The USCG Cutter Dauntless (USCGC Dauntless) successfully located the go-fast vessel, which was traveling without navigational lights. The USCG Dauntless proceeded to launch a Rigid Hull Inflatable Boat (RHIB), along with a boarding crew, to intercept the go-fast vessel.

Once it was in a position to intercept the go-fast vessel, the USCGC Dauntless energized its blue lights, while the RHIB crew pulled up alongside the go-fast vessel, a 1988 thirty-three foot (33') Donzi fishing vessel with twin 250 Yamaha outboard engines, and energized its navigational lights. The RHIB crew verbally and visually signaled the go-fast vessel to stop. However, according to the USCG personnel, the crew of the go-fast vessel disregarded all signals to stop, and attempted to elude the RHIB by traveling at a high rate of speed in a "zigzag" course. The crew of the go-fast vessel then slowed down, forcing the RHIB to move ahead, the go-fast vessel then maneuvered around the rear of the RHIB and sped away.

After initially losing sight of the go-fast vessel, the boarding crew commenced a search and was able to relocate the go-fast vessel. The crew of the RHIB then deployed an entangling device in front of the go-fast vessel. According to the boarding crew of the RHIB, it appeared as though the driver of the go-fast vessel spotted the entangling device and proceeded to halt its course just ahead of the device. The go-fast vessel then immediately maneuvered around the device and continued to elude the USCG.

The crew of the RHIB stated that the go-fast vessel attempted to increase it speed, but appeared hindered. The RHIB

was again able to pull up alongside the go-fast vessel and ordered the crew of the vessel to stop by using verbal and visual signals. Moments later, the go-fast vessel reduced its speed and came to a stop. Once stopped the crew of the RHIB observed numerous individuals stand up from a concealed position on board the go-fast vessel, while one of the individuals threw a small unknown object into the ocean. Water immediately began to flow into the stern of the vessel, due to the shift in the weight and the excess amount of individuals on board. Shortly thereafter, the go-fast vessel capsized, which resulted in the individuals being ejected overboard and into the ocean.

The USCGC Dauntless, along with the crew of the RHIB, and U.S. Customs and Border Protection (CBP) Marine Enforcement Officers (MEO), began to pull the individuals out of the water. However, during the rescue efforts, it was discovered that six year old Julian Villasuso–Hurtado, had died after becoming trapped underneath the capsized vessel.

After safely transferring all of the individuals onto the USCGC Dauntless, USCG personnel discovered that there was a total of thirty-one (31) individuals -including the deceased child—onboard the go-fast vessel. Twenty-nine (29) of the individuals were identified as Cuban nationals who had not received prior official authorization to come to, enter or reside in the United States. The two (2) remaining individuals, Alexander Gil–Rodriguez and Luis Manuel Taboada Cabrera, were identified as suspected smugglers, with parolee status pending adjustment in the United States.

On October 14, 2005, an autopsy was performed by the Monroe County Medical Examiner on the deceased minor. The autopsy determined that the cause of

Court by United States Probation.

death was salt water drowning. At the same time, Julian Villasuso–Delanoval and Naivi Hurtado, parents of the deceased, were transported from the USCGC Dauntless to Key West, Florida, where they were processed by CBP agents and issued Significant Public Benefit Parolee status. Hurtado and Villasuso–Delanoval both indicated that they had been picked up on the Cuban coastline by Gil–Rodriguez and Taboada–Cabrera in a go-fast vessel. Villasuso–Delanoval also stated that he and other Cuban aliens onboard pleaded with the smugglers to stop when they were being pursued by the USCG, but the smugglers disregarded their pleas.

On October 16, 2005, Gil–Rodriguez and Taboada–Cabrera were transported from the USCGC Dauntless and subsequently detained at the Krome Detention Center in Miami, Florida. Both remained at the Krome Detention Center until October 21, 2005, when they were arrested in connection with the instant case.

In post-Miranda statements, Gil–Rodriguez and Taboada–Cabrera stated that on October 12, 2005, the go-fast vessel, owned by a friend named Janet Blanco, was launched from a boat ramp in Key West, Florida. Both stated that they planned to go fishing, but after traveling thirty (30) miles south of the Florida Keys, they encountered a homemade raft with several Cuban aliens sinking and begging for help. After rescuing the aliens, they were approached by a USCG vessel. According to Taboada–Cabrera, Gil–Rodriguez fled from USCG because he was nervous. Both stated that the vessel capsized after the USCG threw unknown objects in front of their vessel.

On November 2, 2005, each Defendant pled guilty to the one-count Information charging each defendant with conspiracy to encourage and induce aliens to come to and enter the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I). Sentencing was scheduled for January 24, 2006 at 1:30 p.m.

## ANALYSIS

On January 24, 2006, the Court held a sentencing hearing wherein the Court gave the parties notice of its intent to upwardly depart from the guidelines. *See* Transcript of Sentencing Proceedings Before the Hon. K. Michael Moore, U.S.D.J. at 10 [hereinafter Jan. Sentencing Hr'g Tr.].

Although the district courts are no longer required to apply the range dictated by the Sentencing Guidelines, they are still obligated to "consult those Guidelines and take them into account when sentencing." *United States v. Gibson,* 434 F.3d 1234, 1243–44 (11th Cir.2006) (citing *Booker,* 125 S.Ct. at 767); *see also United States v. Crawford,* 407 F.3d 1174, 1178 (11th Cir. 2005). Implied in this obligation is the responsibility to "calculate *correctly* the sentencing range prescribed by the Guidelines." *Id.* (citing *Crawford,* 407 F.3d at 1178 (emphasis in original)). A misinterpretation of the Guidelines by the district court "effectively means that [the district court] has not properly consulted the Guidelines." *Id.* (quoting *United States v. Hazelwood,* 398 F.3d 792, 801 (6th Cir. 2005)). Furthermore, "application of the Guidelines is not complete until the departures, if any, that are warranted are appropriately considered." *United States v. Jordi,* 418 F.3d 1212, 1215 (11th Cir.2005).

The Presentence Investigation Report sets forth the following guideline-sentence scoring for both Defendant Gil–Rodriguez and Defendant Taboada–Cabrera: The guideline for an 8 U.S.C. § 1324(a)(1)(A)(v)(I) offense is found in § 2L1.1(a)(2) of the Sentencing Guidelines. That section assigns a base level of twelve (12) for an offense involving smuggling, transporting or harboring any unlawful

alien. Because (A) the offense was committed other than for profit or the offense involved the smuggling transporting or harboring only of the defendant's spouse or child (or both defendant's spouse and child), and (B) the base offense level is determined under subsection (a)(2), the offense level is decreased by three (3) levels pursuant to § 2L1.1(b)(1). Because the offense involved the smuggling, transporting, or harboring of twenty-nine (29) unlawful aliens, the offense level is increased by six levels pursuant to § 2L1.1(b)(2)(B). Because the vessel was carrying substantially more passengers than its capacity, and involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person, the offense level is increased by two levels. However, because the resulting offense level is less than level eighteen (18), it is increased to level eighteen (18) pursuant to § 2L1.1(b)(5). Because any person died or sustained bodily injury, the offense level is increased by eight (8) levels according to the seriousness of the injury pursuant to § 2L1.1(b)(6)(4) of the Sentencing Guidelines. Where as here, a person died, § 2L1.1(b)(6)(4) provides for an increase of eight (8) levels. Because the defendants recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer, the offense level is increased by two levels pursuant of § 3C1.2 of the Sentencing Guidelines. A reduction of three levels is warranted for acceptance of responsibility pursuant to § 3E1.1 of the Sentencing Guidelines.[2] The guideline sentence scoring set forth in the Presentence Investigation Report does not provide for any victim related adjustments, adjustments for role in the offense, or Chapter Four enhancements.

The Defendants have no juvenile adjudications, no adult criminal convictions, and each Defendant has a total of zero criminal history points and criminal history category of I. Additionally, the Presentence Investigation Report indicates that the Defendants have committed no other criminal conduct. With respect to Defendant Gil–Rodriguez, the Presentence Investigation Report indicates one pending charge for grand theft, third degree. Defendant Gil–Rodriguez was arrested on July 1, 2005, by the Miami Police Department, Dkt. # F05–20964. The Presentence Investigation Report also indicates that a review of Gil–Rodriguez's traffic record maintained by the State of Florida under license number G463–000–80–346–0 revealed no traffic convictions. However, the records reflect that he has failed to appear on traffic summons, which has resulted in his driver's license being suspended.

With respect to Defendant Taboada–Cabrera, the Presentence Investigation Report indicates that there are no pending charges against him. The Presentence Investigation Report also indicates that a review of the Defendant Taboada–Cabrera's traffic record maintained by the State of Florida under license number T132–533–76–461–0 revealed two minor traffic convictions and assignment of traffic points. His license remains valid as of December 19, 2005.

The total offense level for each Defendant is therefore 25. The statutory provision in 8 U.S.C. § 1324(a)(1)(A)(v)(I) viola-

---

2. Defendants have made some indication that the death of six year old Julian Villasuso–Hurtado is somehow attributable to the actions of the United States Coast Guard. Defendants protestations that the United States Coast Guard is responsible is inconsistent with acceptance of responsibility. Nevertheless, the Court will give the Defendants the benefit of a three level reduction for acceptance of responsibility in calculating the guideline range.

tion is 0–10 years per alien. The advisory guideline provisions provide for 57 to 71 months with a 2–3 year term of supervised release and a special assessment of $100.00. At the January 24, 2006 hearing, defense counsel did not object to the factual content of the Presentence Investigation Report nor did he object to the scoring, with the acceptance of responsibility adjustment factored into the scoring. This guideline calculation was reaffirmed and agreed to by defense counsel at the March 20th sentencing. No upward or downward departures were made to the 57–71 month guidelines calculation.

■ After it has made this calculation, the district court "may impose a more severe or more lenient sentence as long as the sentence is reasonable." *Crawford* at 1179. However, Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. The District Court must consider those factors to determine a reasonable sentence. *Booker*, 125 S.Ct. at 766; *United States v. Winingear*, 422 F.3d 1241, 1246 (11th Cir.2005).

The factors enumerated in 18 U.S.C. § 3553(a) include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D)

to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for—(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(1)-(7). However, a laundry list of § 3553(a) factors is not required because "nothing in *Booker* or elsewhere requires the district court to state on the record that it has explicitly considered each of the § 3553(a) factors or to discuss each of the § 3553(a) factors." *United States v. Scott*, 426 F.3d 1324, 1329 (11th Cir.2005). Nevertheless, the Court has carefully considered each of the § 3553(a)(1)-(7) factors.

■ Therefore, upon consideration of the advisory guidelines and after consideration of the statutory factors set forth in 18 U.S.C. § 3553, the Court imposes a reasonable sentence after concluding that:

(1) An eight level guideline enhancement does not adequately take into consideration the death of a six year old child [3];

(2) the current guideline provides insufficient and inadequate deterrence for this type of offense; [4] and

---

**3.** The Court notes the age of the child only to show that the child could not take care of itself and to call attention to the fact that the advisory guidelines do not differentiate between the type of victim, but only the degree of injury. *See* U.S. Sentencing Guidelines Manual § 2L1.1(b)(6) (2005). The Court does not, however, purport to draw factual conclusions or consider other factors about the victim when considering the totality of the cir-

cumstances for sentencing. *Cf. Aleman*, 99 Fed.Appx. 879, No. 02–16621 at *8–9 (noting that victim "may have been a weak individual" and relating the facts of her death when considering the appropriateness of the sentence imposed).

**4.** According to data from this district's Clerk of Court, the number of alleged "bringing in and harboring aliens" cases was 27 in 2005.

(3) the USCG was unnecessarily put at risk of property damage and personal injury in this high speed pursuit. Accordingly, it is the judgment of the Court that the advisory guidelines in this case do not adequately reflect the seriousness of the offense nor do those guidelines adequately promote respect for law.

The Defendants argue that the pre-*Booker* case of *United States v. Aleman*, 99 Fed.Appx. 879 (11th Cir.2004), precludes any sentence other than a guideline sentence. In light of *Booker* and considering the facts in this case, the Court finds that *Aleman* does not apply. In *Aleman*, the defendant raised a notice issue on appeal. The defendant in *Aleman* noted that under *Burns v. United States*, 501 U.S. 129, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991), the district court must "provide the parties reasonable notice that it is contemplating a departure, before the court departs from the guideline range on a ground not identified for departure either in the [PSI] or in a prehearing submission." *Aleman*, at *3 (citing *Burns*, 501 U.S. at 138–39, 111 S.Ct. 2182). Further, the court in *Aleman* held that when upwardly departing, a district court may not consider facts and factors beyond those for which the defendant received notice and forewarning. *Id.* at *5. Here, the Defendants received notice of the Court's intent to consider a longer sentence than that recommended by the Guidelines. *See* Jan. Hr'g Tr. at 10.

The Court has considered the advisory guidelines and calculated the recommended sentence under them. *United States v. Williams*, 435 F.3d 1350, 1353 (11th Cir.2006) (construing *United States v. Crawford*, 407 F.3d 1174, 1178 (11th Cir.2005)). For the reasons discussed above, this Court concludes that, after consideration and calculation of the advisory guidelines as well as the factors contained in 18 U.S.C. § 3553(a)(1)-(7), a sentence of 120 months as to each Defendant is reasonable.[5]

ORDERED AND ADJUDGED that the Defendants each serve a sentence of one hundred twenty (120) months imprisonment, three (3) years of supervised release, and a $100.00 special assessment.

---

**5.** The Court notes that the sentence imposed equates with a five (5) level increase above the advisory guidelines.